# Illinois Official Reports

## Appellate Court

***People v. Nelson*, 2020 IL App (1st) 151960**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GERALD NELSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-15-1960 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-25136; the Hon. Allen F. Murphy, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and S. Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    In January 2001, seven-month-old Gerelle Nelson suffered a catastrophic neurological collapse. The attending pediatricians concluded that he must have been violently shaken by the caregiver who was with him at the onset of his symptoms. Confronted with this classic diagnosis of "shaken baby syndrome" (the forerunner of "abusive head trauma"), Gerelle's father, defendant Gerald Nelson, confessed that he shook Gerelle—not in malice but in frustration—when Gerelle would not stop crying.

¶ 2    Defendant pleaded guilty to aggravated battery of a child. As the charge implies, Gerelle had survived the trauma. But his injuries and resulting motor deficits were profound and largely irreversible. Gerelle suffered from spastic quadriplegic cerebral palsy.

¶ 3    In April 2006—more than five years after he sustained his injuries, and while defendant was in prison—Gerelle was found facedown in a pillow. He had suffocated to death. As for how Gerelle wound up in these fateful circumstances, an event no witness claimed to see, the State took the position that he must have rolled over while sleeping.

¶ 4    The State charged defendant with Gerelle's murder. On the issue of causation, the State's theory was that defendant's conduct over five years earlier of shaking the baby caused the injuries that left Gerelle unable to lift his head from the pillow and thus vulnerable to suffocation, in what would have been fairly benign circumstances for a normally developed near-six-year-old child. In this way, defendant's conduct was a contributing cause of Gerelle's death.

¶ 5    A key defense argument at trial was that the State's own evidence gave rise to a question of supervening causation. Specifically, the State's theory of how Gerelle wound up in this compromised position—he rolled over in his sleep—was contradicted by his mother's testimony that he was unable to roll over (or walk, or crawl, or sit up) on his own. Thus, the State now had to prove, beyond a reasonable doubt, that no supervening cause was responsible for Gerelle's tragic death. And the State failed to carry that burden. Or so the defense argued.

¶ 6    On appeal, defendant argues (among other things) that the trial court misunderstood the law of supervening causation. We agree. In our view, what the trial court failed to grasp was precisely the point that defense counsel tried to hammer home during closing argument: that it was the State's burden to prove the absence of a supervening cause of death beyond a reasonable doubt. Our review of the record convinces us that this error was not harmless. We reverse and remand for a new trial.

¶ 7                                                      BACKGROUND
¶ 8                                                            I
¶ 9    In late January 2001, Gerelle Nelson was a seemingly healthy seven-month-old baby. He lived in Sauk Village with his father, defendant Gerald Nelson; his mother, Belinda Michelle Nelson (following the parties' general practice in the trial court, we will call her Michelle); and his half-sister, Brianna Simpson, Michelle's daughter from a past relationship. Michelle worked day shifts, and defendant worked night shifts. They divided responsibility for Gerelle's care accordingly, leaving him in the care of six-year-old Brianna, for a time, when Michelle would have to leave for work in the morning before defendant returned home.

¶ 10     Such were the circumstances on the morning of January 29, 2001. Michelle left for work around 6:30 a.m. Gerelle was asleep in his crib. Defendant came home from work about an hour later, took Brianna to school, shoveled the driveway, and went inside to change Gerelle's diaper. Around 9:30 a.m., he called 911 to report that Gerelle was not breathing. The first responders found defendant holding a listless Gerelle in his arms. They revived Gerelle with cardiopulmonary resuscitation and took him to St. Margaret Mercy Hospital in Indiana.

¶ 11     Defendant initially told the police, in sum, that he woke Gerelle and put him down on the floor to change his diaper. The phone rang, and defendant left Gerelle's room to answer it. In the kitchen, defendant decided not to take the call after all; instead, he prepared a bottle and a bowl of baby cereal for Gerelle. But all the while, Gerelle had been crying, so defendant went back to check on him. He found Gerelle with a plastic bag over his face. Defendant had put that bag on the floor, alongside the other supplies for changing Gerelle, to use as a receptacle for the dirty diaper. Defendant took the bag off Gerelle's face and saw that he was not breathing. Defendant tried to revive him for about 15 minutes, to no avail, and then called 911.

¶ 12     While Gerelle was being treated in the hospital, the police investigated the scene. On the floor in Gerelle's room, they found a fresh diaper and clothing, wipes and baby powder, and a plastic bag with "some kind of substance spot" on it that looked like saliva. (There is no evidence that the substance was ever tested.) In the kitchen, they found a prepared bottle of formula and a cup of baby cereal. The caller identification showed that the last incoming call was received at 9:21 a.m. Defendant's 911 call was received at 9:37 a.m., 16 minutes later.

¶ 13     Dr. Troy Shaffer, an emergency physician at St. Margaret Mercy Hospital, treated Gerelle for hypoxia and acute respiratory failure. This diagnosis was based on the history conveyed by defendant and on Gerelle's presenting symptoms—minimal spontaneous respirations and a need for mechanical ventilation, unreactive pupils, and a lack of purposeful movements. In short, he was unresponsive but with no external signs of trauma. Of particular concern, however, was his decerebrate posturing, meaning that his muscles were locked in a position that could indicate a severe brain injury. Dr. Shaffer recognized that Gerelle would need a higher level of care than a local hospital could provide. When Gerelle was stabilized—that is, in critical condition but likely to survive transport—he was taken by ambulance to Children's Memorial Hospital in Chicago.

¶ 14     There, Gerelle was examined and treated by an interdisciplinary team of physicians, led by Dr. Amy Goldberg, a fellow in child abuse pediatrics working under the supervision of Dr. Emily Flaherty. Between January 29 and February 1, 2001, the team performed a battery of neurological, ophthalmic, radiological, and other tests on Gerelle. Many of the salient findings were presented at defendant's trial, in extensive, often technical, and sometimes contested expert testimony. Suffice it to say, for our purposes here, that those findings included a parietal fracture in Gerelle's skull, a subdural hematoma, and bilateral cerebral and retinal hemorrhaging.

¶ 15     These injuries, Dr. Goldberg and the other treating physicians believed, could not be explained by a hypoxic event like suffocating on a plastic bag. After considering and ruling out several differential diagnoses, they concluded that Gerelle had "shaken baby syndrome," the prevailing diagnosis of exclusion at the time.

¶ 16     On February 1, 2001, Dr. Goldberg told Detective Cates that Gerelle's injuries were the result of being shaken. Detective Cates confronted defendant about Gerelle's skull fracture and retinal hemorrhaging. Defendant held fast to his account of events. He denied that he shook

Gerelle and insisted that he would never intentionally hurt his son. But he could not explain how Gerelle's skull was fractured. Defendant was taken into custody. Later that day, he agreed to give a written statement.

¶ 17　Defendant said in his statement that Gerelle would not stop crying. While changing his diaper, defendant lifted him by the arms and shook him back and forth for 30 seconds. Gerelle's eyes rolled back in his head, and he stopped breathing. Defendant tried at first to resuscitate Gerelle and then called 911 after his efforts were unsuccessful. He never meant to hurt Gerelle and was sorry for shaking him so hard. Defendant also said that he lied about finding a plastic bag over Gerelle's face because he was scared.

¶ 18　More than four years later, on August 15, 2005, defendant pleaded guilty to aggravated battery of a child. The stipulated factual basis of the plea, which was admitted into evidence at defendant's murder trial, stated that defendant "admitted that he was watching the baby alone, the baby was crying. He was frustrated, he shook the baby for approximately 30 seconds, and the baby's eyes rolled back in its head."

¶ 19　While the aggravated battery case was pending, the judge concluded that he "didn't see [defendant] as a threat" and thus allowed him supervised visitation with Gerelle and Michelle. This ongoing "family structure" and other substantial mitigating factors convinced the judge to impose the minimum prison sentence of six years.

¶ 20　　　　　　　　　　　　　　　II

¶ 21　Meanwhile, Gerelle had been diagnosed with cerebral palsy as a result of his injuries. In mid-February 2001, he was discharged from Children's Memorial Hospital into the care of Dr. Charles Sisung at the Rehabilitation Institute of Chicago. After Gerelle returned home with his mother, Dr. Sisung continued to provide outpatient therapy to Gerelle.

¶ 22　In his stipulated testimony, Dr. Sisung stated that Gerelle suffered from quadriplegia, muscle spasticity and contracture, seizures, and very limited motor control and cognitive function. Dr. Sisung last saw Gerelle in March 2006. He was at his "most improved state" at that time, but he still "lacked significant motor control and had decreased mobility." He could not walk or crawl on his own, but he could hold a toy in his right hand. Dr. Sisung prescribed muscle relaxers for Gerelle's spasticity. Another physician prescribed seizure medication.

¶ 23　Michelle elaborated in her testimony on Gerelle's physical and intellectual abilities. In early 2006, as he approached his sixth birthday, Gerelle could not walk, crawl, or even sit up on his own. He was limited in what he could do with his arms or legs. He could express himself through sounds but otherwise had a minimal vocabulary. Michelle described Gerelle's seizures as mild and not violent: Gerelle would "extend his arms out a little bit and just retract them back. And his eyes would roll back a little bit." In any event, Gerelle was no longer taking seizure medication, but he was still taking the muscle relaxers prescribed by Dr. Sisung for spasticity.

¶ 24　Gerelle was also prescribed braces for his arms and legs. Dr. Scott Denton, the medical examiner who conducted Gerelle's autopsy, described the leg braces as orthopedic braces used to prevent flexure contractures of the legs. They consisted of a pair of inner braces, worn day and night, each running the length of one leg and helping to keep that leg straight, and one outer foam brace, worn only at night, that wrapped around both legs and bound them tightly together, further restricting any movement. Dr. Denton explained that the purpose of the

braces, and of keeping Gerelle's legs straight, was to prevent additional muscle atrophy, which would have further dimmed Gerelle's prospects for recovering some use of his limbs.

¶ 25    Michelle described the arm braces as foam braces that went around the elbow, with a steel plate inside. Gerelle's arms were typically locked at 90-degree angles, and the braces were meant to straighten his arms and prevent him from putting his hands in his mouth. Unlike the leg braces, the arm braces are not depicted in any of the autopsy or crime-scene photos.

¶ 26    Defense counsel asked Michelle, "When [Gerelle] had those leg braces and arm braces on, did he have the ability to roll over in any way," and "Did you ever see him with the ability to roll over when he had those braces on?" Both times, Michelle answered "no."

¶ 27    It was against this backdrop that Michelle put Gerelle to bed on April 22, 2006. Michelle had recently purchased a wood-framed bed for Gerelle, which she described as a "toddler bed," but she had not yet assembled it. Michelle initially testified, on direct examination, that she was not sure whether she "had any bed rails" for it. On cross-examination, she testified that the bed came with rails but they were still in the box and that the function of the rails, when installed on the side of the bed, was to keep anyone in the bed from rolling off. Instead of the bed rails, Michelle put a large body pillow next to the bed. That way, she said, "If [Gerelle] did scoot out of the bed, so it would brace his fall so he wouldn't hurt himself."

¶ 28    Michelle testified that she put Gerelle to bed around 8 p.m. She gave him his muscle relaxer, put his arm and leg braces on, and laid him on his back, in the center of the bed. She returned to check on him the next day, sometime around 10 a.m., she thought—or so she testified. The timing of her daughter's 911 call suggested that she checked on Gerelle closer to noon, or about 16 hours after she had put him to bed.

¶ 29    Michelle found Gerelle "[f]ace down on the pillow" next to the bed. She could not recall where his legs were, but she "assume[d]" they were "on the side of him like alongside the bed." And she described his body as "just kind of layed [*sic*] on the side." His body was cold. Michelle screamed, pulled him up, and set him down again on the bed. The rest was a "blur," as Michelle described herself as a "wreck" at the time.

¶ 30    Michelle surmised that Brianna must have called 911 after hearing her scream. That call was received at 12:27 p.m. Then-sergeant Rebecca Sailsbery was the first to respond. Brianna, then around 11 years old, showed her to Gerelle's bedroom, where Michelle was sitting on the bed, next to Gerelle, and crying.

¶ 31    Gerelle was on his back and wearing a leg brace. His body was cold, he had no pulse, and he did not appear to be breathing. His arms—as also depicted in the crime-scene photos—were raised, stiff, and locked in a flexed position. He was not wearing his arm braces.

¶ 32    The crime-scene photos also depict Gerelle's mattress. It is evidently an adult-sized (most likely a full-size) mattress, laid on the floor, without bed rails or a frame. There is a pillow centered at the head of the mattress, in the usual place, for Gerelle's head. One side of the mattress is pushed against the wall; the other side has a large pillow, made of velour or some similar material, abutting it. The autopsy report lists its dimensions as 37 by 14 by 11 inches.

¶ 33    One spot in the pillow caught Sgt. Sailsbery's attention because it looked "different than the rest." It was an "oval" indentation, in "[t]he shape of a mouth," with an apparent "substance" on it. Dr. Denton, who examined the pillow at Gerelle's autopsy, described the "substance" as dried mucus, saliva, or fluid (of some sort) that accompanied an "impression

mark of someone's face." The crime-scene photos depict the oval; no other indentations on the pillow are evident.

¶ 34    Gerelle's autopsy revealed no bed sores or similar evidence of neglect in his care. Dr. Denton testified that Gerelle died with his elbows flexed and locked in the "abnormal position" already described, and with his fingers tightly clenched. This position could have been the result of his muscle atrophy and, thus, the typical position of his arms, or if his arms were not usually in this position, it could have resulted from a seizure or asphyxia. Gerelle was tested for traces of his prescribed muscle relaxer; the autopsy report, which was received into evidence, indicates that none were detected.

¶ 35    Based on his physical findings alone, Dr. Denton explained, it would have been "very difficult" to determine the cause of Gerelle's death. For that purpose, he had to rely heavily on "history and context," especially Michelle's statements to investigators about the circumstances in which Gerelle's body was found.

¶ 36    As conveyed to Dr. Denton, Michelle told investigators that Gerelle was "face down" and "off the edge of a bed on [a] body pillow that was next to the bed." Dr. Denton inferred that Gerelle was "at an angle with his face in [the] area" of the pillow that had an impression and dried fluid. In other words, he must have been "face down with basically the contact of his face, mouth and nose against the body pillow and his legs were up on the bed which were in a brace."

¶ 37    Based on these circumstances and physical findings, Dr. Denton ruled that the immediate cause of death was positional asphyxia: Gerelle suffocated to death in the pillow. But a child of Gerelle's age could normally "roll over" and remove his face from a pillow to avoid suffocating. Dr. Denton thus inquired as to "what would cause [Gerelle] to go from the bed to being in this compromised position where he can't free himself or breathe."

¶ 38    In the first instance, Dr. Denton concluded, Gerelle could not free himself from the body pillow because his legs were locked in place by his braces: "So if the history is he's sleeping and these are used at night and he rolls off the bed and he would be fixed with this device on his legs, he could not extricate himself from that position."

¶ 39    Dr. Denton then took the cause-of-death inquiry one step further. The autopsy revealed that Gerelle had sustained significant "older injuries" to his brain, which themselves required an explanation; that explanation, in turn, might help to explain his lack of mobility and resulting vulnerability to suffocation in these circumstances.

¶ 40    To this end, Dr. Denton removed and examined Gerelle's brain in collaboration with a neuropathologist. He also reviewed Gerelle's extensive medical history, including the findings made by Dr. Goldberg's team in the days immediately following Gerelle's neurological collapse. In sum, Dr. Denton concurred that Gerelle's old injuries were not consistent with asphyxia alone but rather were the result of "rotational acceleration injury"—often said to be the telltale sign of a shaken baby—and accompanying "blunt head trauma."

¶ 41    The complete cause of death was thus a "series." First, Gerelle died of asphyxia because he was in a "compromised position." Second, that compromised position was the result of his old cerebral injuries. Although Dr. Denton did not make this point explicitly, his testimony implied that Gerelle's cerebral injuries resulted in his compromised position in two (related) ways: by directly causing his lack of motor control and by requiring him to sleep in leg braces

that further restricted his mobility. Third, and finally, Gerelle's cerebral injuries were the result of the head trauma he sustained in 2001.

¶ 42 Dr. Denton thus ruled Gerelle's death a homicide—that is, a homicide by the person who had caused Gerelle's head trauma. Based on this theory of causation and defendant's admission that he shook Gerelle, the State charged him with intentional and strong-probability murder. See 720 ILCS 5/9-1(a)(1)-(2) (West 2006).

¶ 43 Defendant was convicted of those charges after a bench trial in 2015, 14 years after Gerelle's injuries, and sentenced to 25 years in prison, with credit for the sentence he had served on his aggravated-battery plea.

¶ 44 ANALYSIS

¶ 45 I

¶ 46 Defendant claims that the trial court misunderstood the law of supervening causation, one of the principal theories of defense presented at trial. In particular, he says, the court's remarks on this issue, in ruling on his posttrial motion, rebut the usual presumption that the trial court understood the law. And that error, he says, deprived him of a fair trial.

¶ 47 A

¶ 48 The due process clause requires the State to prove, beyond a reasonable doubt, every element included in the definition of the charged offense. *In re Winship*, 397 U.S. 358, 364 (1970); *Patterson v. New York*, 432 U.S. 197, 210 (1977). One element of first degree murder is causation. 720 ILCS 5/9-1(a) (West 2006) ("[a] person who kills an individual *** commits first degree murder if, in performing the acts which cause the death"). And necessarily so: since liability for this offense arises from a prohibited *result*, the victim's death, the offense inherently requires a causal link between that result and the defendant's (or an accomplice's) conduct. *People v. Nere*, 2018 IL 122566, ¶ 31 (citing 1 Wayne R. LaFave, Substantive Criminal Law § 6.4, at 628 (3d ed. 2018)).

¶ 49 The causation element of murder has two basic components: cause-in-fact and legal, or proximate, causation. *Id.* For intentional and strong-probability murder (we leave aside felony murder, which is a somewhat different matter), our supreme court has articulated these basic components of causation as follows.

¶ 50 First, a defendant's conduct is a cause-in-fact if it was a contributing factor in, but not necessarily the sole or immediate cause of, the victim's death. *Id.* ¶¶ 31-33; *People v. Brackett*, 117 Ill. 2d 170, 176 (1987). Suppose, for example, that a victim dies of direct complications of injuries caused by the defendant's attack. Those complications are the immediate cause of death. But the defendant's conduct in injuring the victim was also a contributing factor in, and thus a cause-in-fact of, the death. See, *e.g.*, *People v. Amigon*, 239 Ill. 2d 71, 77-80 (2010) (victim, quadriplegic as result of shooting, caught ordinary, usually nonthreatening respiratory infection and died of pneumonia, a common complication of quadriplegia); *Brackett*, 117 Ill. 2d at 177-78 (attack left elderly defendant unable to accept feeding tube, swallow, or expel food from her trachea, resulting in her choking death when medical personnel tried to orally feed her).

¶ 51 Second, a contributing cause of the victim's death is often—indeed, usually—a proximate or legal cause of death, too. See *Amigon*, 239 Ill. 2d at 77-80; *Brackett*, 117 Ill. 2d at 176-78.

But not always or necessarily. Even if a defendant causes potentially fatal injuries, the victim's death must " 'occur in a manner enough similar to' " the " 'manner which the defendant intended' " for the defendant's conduct to count as the legal cause of the death. *Nere*, 2018 IL 122566, ¶ 31. And the question is ultimately one of fairness: The causal link between the defendant's conduct and the victim's death must be sufficiently close " 'that the defendant may *fairly* be held responsible for the actual result.' " (Emphasis added.) *Id.* (quoting 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(a), at 630-31 (3d ed. 2018)).

¶ 52 Thus, if some new causal factor, " 'completely unrelated to' " or unconnected with the defendant's conduct, intervenes and brings about the victim's death, that new factor will "relieve the defendant of criminal responsibility" for the death, notwithstanding the defendant's original infliction of potentially fatal injuries. *People v. Domagala*, 2013 IL 113688, ¶ 39; *Brackett*, 117 Ill. 2d at 176; Illinois Pattern Jury Instructions, Criminal, No. 7.15 (4th ed. Supp. 2011) (hereinafter IPI Criminal 4th (Supp. 2011)). A third party's gross negligence toward, or intentional "maltreatment" of, the victim are two (among other) examples of this kind of supervening, intervening, or superseding cause. *Domagala*, 2013 IL 113688, ¶ 39.

¶ 53 As an aside, we do not accept the State's assertion that only gross *medical* negligence can count as a supervening cause. While the cases cited all involve allegations of gross medical negligence, we are not aware of any case that expressly limits gross negligence, as a category of supervening cause, to "medical providers." Nor do see any reason in principle for that limitation. Anyone who owes a duty of care can be grossly negligent in performing that duty and therefore can, in principle, be a supervening cause of another's death.

¶ 54 We will have more to say about supervening causation, but for now, the point we need to bring into focus is this: Because the absence of a supervening cause of death is one aspect of the causation element of the offense, as our supreme court has interpreted it, the burden of proof on this issue lies with the State, as a matter of due process. *Patterson*, 432 U.S. at 210.

¶ 55 IPI Criminal 4th (Supp. 2011) No. 7.15, the pattern instruction on the issue of "Causation In Homicide Cases Excluding Felony Murder," states this burden explicitly. The instruction provides that "the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and *that the death did not result from a cause unconnected with the defendant*." (Emphasis added.) *Id.*

¶ 56 We acknowledge our supreme court's statements, repeated most recently in *People v. Staake*, 2017 IL 121755, ¶ 53, that, once the defendant's conduct is proven to be a "sufficient cause," the victim's death "is presumed to have resulted" from that conduct. Or what comes to the same: If the defendant's conduct was a contributing cause of the victim's death, it is "presumed" to be a legal or proximate cause.

¶ 57 But that cannot mean, as the State would have it, that the defendant bears the burden of "rebutting" this "presumption," in the sense of having to prove that there *was* a supervening cause of the victim's death. As far as we can tell, from the cases cited in the briefs and our own research, our supreme court has never held *that*.

¶ 58 And with good reason. As the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/1-1 *et seq.* (West 2006)) stands, the absence of a supervening cause is part of an element of the crime of murder, and due process thus requires the burden of proof—more precisely, the burden of persuasion *and* the burden of production—to lie with the State; it cannot be shifted onto the defendant, by means of a rebuttable presumption or otherwise. *Sandstrom v. Montana*,

- 8 -

442 U.S. 510, 523-24 (1979) (rebuttable presumption that shifts burden of persuasion onto defendant on element of offense violates due process); *People v. Watts*, 181 Ill. 2d 133, 147 (1998) (rebuttable presumption that shifts burden of production onto defendant on element of offense violates due process); see also *Patterson*, 432 U.S. at 210; *Mullaney v. Wilbur*, 421 U.S. 684, 691-702 (1975) (where malice was element of murder statute, defendant could not be required to rebut presumption that the killing was with malice); *People v. Jeffries*, 164 Ill. 2d 104, 114 (1995) ("A defendant's due process rights are violated when the burden shifts to the defendant to disprove an element of the offense.").

¶ 59    And for what it is worth, even if supervening causation was carved out of the causation element and treated as an affirmative defense to murder—which it is not—the burden of proof would remain with the State under section 3-2 of the Criminal Code, which holds the State to the burden of proof even on an affirmative defense (besides insanity). 720 ILCS 5/3-2 (West 2006); *People v. Hari*, 218 Ill. 2d 275, 297 (2006). One way or the other, the burden of proof on this issue will always lie with the State, at least in Illinois.

¶ 60    The State cites *People v. Mars*, 2012 IL App (2d) 110695, ¶ 17, where the court cast this "presumption" in the following terms: "Once the State establishes a sufficient legal proximate cause of death through an act for which the defendant is responsible, a presumption arises that the death resulted from the culpable act of the defendant." And this "presumption," the court added, "then must be rebutted by the defendant's presentation of contrary evidence that the *sole* cause of death was" the supervening cause. (Emphasis in original.) *Id.*

¶ 61    It is not clear that these passages from *Mars* mean what the State says they mean, that the "presumption" places the burden on the defendant to prove the *existence* of a supervening cause of death. In any event, that interpretation of *Mars*, for the reasons we have explained, is inconsistent with settled principles of due process; the burden of proof *never* shifts to the defendant on the question of supervening cause. If the State is correctly reading *Mars*, we respectfully disagree with that decision on this point.

¶ 62    When we talk about a "presumption" in the context of supervening causation, we are not talking about a shifting of the burden of proof to the defendant. The only thing we mean—the only thing we constitutionally *could* mean—is this: Unless there was a supervening cause, a contributing cause of the victim's death is presumed to also be a legal or proximate cause, and it is therefore sufficient to establish causation under the first degree murder statute.

¶ 63    This "presumption," in short, is a principle of liability. If there is no issue as to supervening causation (there usually is not), causation is proven if contributing causation is proven. But in those rare cases where supervening cause is an issue, the trier of fact may not convict a defendant unless it *also* finds that the State has proven, beyond a reasonable doubt, that there was no supervening cause of death. IPI Criminal 4th (Supp. 2011) No. 7.15; see also IPI Criminal 4th (Supp. 2011) No. 7.15, Committee Note (give instruction where "causation is an issue"); *People v. Pinkney*, 322 Ill. App. 3d 707, 718 (2000) (instruction should be given where supervening causation "is argued by the defense").

¶ 64    With this preliminary but critical point in mind, we turn next to the parties' presentations of their theories in closing arguments.

¶ 66     Relying principally on our supreme court's decision in *Brackett*, 117 Ill. 2d 170, the State argued that the sum total of its burden, on the issue of causation, was to prove that defendant's conduct "contributed to" Gerelle's death. And his conduct did, the State argued, because it "set[ ] in motion the chain of events" that culminated in Gerelle's death, five years later, when he "rolled off the bed" and "landed face down in a pillow," unable to right himself because of the injuries defendant had caused. In other words, if defendant shook Gerelle (as he admitted he did), and if the shaking caused his neurological injuries and associated motor deficits (as the State took Dr. Goldberg's testimony to establish), then there was "sufficient proof of causation" for a murder conviction.

¶ 67     The defense returned to a theme it had sketched in its opening statement: that some of the evidence to be adduced "will go to cause of death," specifically, "to supervening cause of death." Elaborating on this theme in its closing argument, the defense homed in on the question of how Gerelle wound up facedown in the body pillow. Very little was known about this tragic event. There was no eyewitness account. And one cannot "assume," as the State maintained, that Gerelle somehow "rolled off the bed" of his own volition.

¶ 68     That hypothesis, the defense argued, did not square with Michelle's testimony that he could *not* roll over at all, at least not when he was wearing his braces. More generally, it did not square with the evidence of Gerelle's significant motor deficits and immobility, particularly when his legs were tightly bound together at night by the external brace. Nor could a trier of fact reasonably find that a violent seizure jerked Gerelle out of the bed, since Michelle testified that he no longer needed seizure medication and that his seizures, when he did have them, were "mild," anyway, affecting only his eyes and arms.

¶ 69     So what *did* happen to Gerelle? The defense did not claim to have a definitive answer. Its point, rather, was that the State failed to exclude a "supervening cause of death." One unsettling implication—that Gerelle could have been the victim of an intentional act by either his mother or sister—was clear enough, but counsel, for obvious reasons, was none too eager to draw out that implication in explicit terms. Counsel did propose, however, that Gerelle's death could have been the result of "gross negligence" in his care, since the evidence showed, among other things, that a six-year-old spastic quadriplegic was left unattended for no less than 16 hours.

¶ 70     In rebuttal, the State painted defense counsel's argument as a flat-out accusation that Michelle murdered Gerelle. Beyond that, the State insisted that "there is not a causation issue. There is not an issue with the circumstances of the way this child was found. That child, if it wasn't for the defendant, that child could have got up and ran away, but he couldn't because of what this defendant did." Defendant, in other words, was a contributing cause of Gerelle's death, and that was the end of the matter. As for the question posed by the defense's supervening-cause argument—how did Gerelle wind up in the pillow?—the State simply reiterated, without further elaboration, "[o]bviously, this had [*sic*] child fell into the pillow, fell into the pillow and suffocated."

¶ 71     Let us briefly take stock, before moving on to examine the trial court's findings and remarks on the issue of supervening causation. There is no denying that the defense raised the issue, making it a central theme of the case (among others) all the way through the trial, from opening statements to closing arguments.

¶ 72     And the issue was not one that the State, or for that matter the trial court, could brush aside as inconsequential. A fuller discussion of its merits will have to wait, but we will say this much

for the time being: The defense had a point. The State's case left open serious questions about the circumstances of Gerelle's death, insofar as its only *theory* (that Gerelle rolled over into the pillow) appeared to be directly at odds with its own *evidence* (that Gerelle could not, in fact, roll over). And that created a triable issue regarding a potential supervening cause of death, some act or event, apart from defendant's conduct, that explained how Gerelle wound up facedown in the pillow in which he suffocated. *Cf. People v. Everette*, 141 Ill. 2d 147, 157 (1990) (noting that State's own evidence may give rise to question of self-defense); *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 45 (same).

¶ 73    With the question thus at issue, it was the State's burden to prove, beyond a reasonable doubt, that Gerelle's death did not result from a supervening cause. And the trial court, for its part, had to hold the State to that burden.

¶ 74                                                               C

¶ 75    In its detailed findings, the trial court focused on the contested medical testimony and the question whether defendant's conduct caused Gerelle's neurological injuries and resulting motor deficits. As to the circumstances of Gerelle's death, the trial court found, simply, that Michelle discovered him "face down in a pillow," with his leg braces on and that he could not remove his face from the pillow because of the injuries that defendant had caused. In an otherwise comprehensive recitation of its findings, spanning 24 pages of transcript, the one topic on which the trial court said not a single word was the issue of supervening causation.

¶ 76    That absence was not lost on defense counsel, who immediately raised the issue to the court:

> [DEFENSE COUNSEL]: Judge, is there a finding on the causation? I don't even know if you touched on that issue.
>
> THE COURT: There is a finding of first degree murder, finding of guilty on first degree murder, both counts. That's the Court's ruling in this case.

¶ 77    Defendant's posttrial motion thus alleged that the trial court erred "in not giving a finding of fact on the defendant's argument of a supervening cause of death." The court's response to that posttrial argument—the one and only time it addressed it—forms the crux of this issue on appeal.

¶ 78                                                               1

¶ 79    But first, we must address the State's argument, however briefly made, that defendant has forfeited this claim of error. Forfeiture occurred, says the State, *not* because defendant did not raise the issue of supervening cause at trial (he clearly did, repeatedly and pointedly, at every stage of trial) and *not* because defendant failed to raise it posttrial (he obviously did) but because, in the State's view, defendant's theory of supervening causation at trial differed from the one he now argues on appeal. According to the State, at trial, defendant accused Gerelle's mother of murdering her child, rolling him over onto the pillow, knowing that he would suffocate. On appeal, says the State, defendant is merely suggesting that Gerelle's death was the result of "gross negligence," in that his mother failed to restrain or secure Gerelle in the bed and did not check on him for 16 hours after putting him to bed the previous night.

¶ 80    The State is wrong, for more than one reason. For one thing, the underlying predicate of its forfeiture argument is not supported by the record. Defense counsel never outright said that

Gerelle's mother intentionally acted against her child. Counsel did, on the other hand, specifically argue that, in the absence of any evidence as to how the child ended up facedown in a pillow, the cause of death could have been an act of "gross negligence."

¶ 81 Was there an implication that another theory of cause of death might have been an intentional act of murder? Probably so. It is a sensitive matter, accusing a mother of murder—even one faced with such an arduous, around-the-clock task, over the past five years, of caring for the most disabled of children—which might explain why the prospect may have been left dangling, unspoken, at trial. Enough so, at least, that the State chastised defense counsel in rebuttal closing for even suggesting that possibility.

¶ 82 But just because the State accused defendant at trial of making that argument does not mean that he did. Nor does it change the fact that, even if defendant's position could be read as such, defendant *also* argued the mother's "gross negligence," a quote taken directly from the defense's closing argument. Defendant was obviously free to argue more than one supervening cause of death. The State's forfeiture argument, in other words, ignores the argument defendant *explicitly* raised—"gross negligence"—and claims that the *only* argument defendant raised was one counsel never said aloud. Needless to say, we do not find any merit in that argument.

¶ 83 We would add, secondly, that, even if the State had accurately represented the record to us and defendant only argued intentional murder as a supervening cause, we still would not find forfeiture here. Defendant had no burden of proof on this question. As we have noted above, defendant need only raise the issue of supervening causation (he did), and there need only be slight evidence to support it (there was), and the burden then falls on the State to disprove supervening cause. Whether that supervening cause was intentional murder or gross negligence, defense's argument on appeal is the same: the trial court never *considered* the State's burden to disprove supervening cause beyond a reasonable doubt, regardless of how, precisely, defendant presented that argument in the trial court. The precise formulation of that argument in the trial court might be relevant to the merits of that argument, but it would have nothing to do with forfeiture of the issue raised here on appeal.

¶ 84                                          2

¶ 85 On to the merits. As noted, despite the defense's consistent claim in both its opening statement and closing argument that supervening causation was an element the State could not disprove, the trial court made no mention of it in its extensive findings. Its absence was even more notable given the extensive findings the trial court made on the scientific evidence. Nor did the trial court address it even when defense counsel specifically asked for its finding on causation.

¶ 86 Still, a trial court is "not required to mention everything—or, for that matter, anything—that contributed to its verdict." *People v. Curtis*, 296 Ill. App. 3d 991, 1000 (1998). So the trial court's initial silence alone, conspicuous as it might seem, does not support a claim of error in and of itself.

¶ 87 That is not to say, however, that the trial court's initial omission of the issue cannot take on new significance in light of what it *did* say later on, in ruling on the posttrial motion. After defendant alleged posttrial that the trial court failed to consider the element of lack of supervening cause, the trial court responded:

"With regard to the argument of a supervening cause of death, I don't know if that refers to what happened to him later in life, in terms of how he was positioned in the bed or whatever. I believe that he was put in that state by the defendant's actions."

¶ 88    The parties go to great battle over what the trial court meant here. We start with the presumption that the trial court understood and correctly applied the law at a bench trial— unless the record affirmatively shows otherwise. *People v. Hernandez*, 2012 IL App (1st) 092841, ¶ 41.

¶ 89    This presumption is seldom overcome, but on a few occasions, we have ordered a new trial where it was clear that the court, sitting as the trier of fact, misunderstood some aspect of the burden of proof. See, *e.g.*, *id.* (trial court misinterpreted element of statute); *People v. Robinson*, 368 Ill. App. 3d 963, 977-78 (2006) (same); *People v. Kluxdal*, 225 Ill. App. 3d 217, 224 (1991) (court applied improper burden of proof to insanity defense).

¶ 90    The State says that the trial court's quote above shows that it understood and properly applied the law by "reject[ing]" defendant's "purely speculative theory." The State's argument goes like this: (1) Defendant's shaking of the baby, causing brain injuries, was a contributing cause of Gerelle's death; (2) once proven, there is a presumption that defendant is legally responsible for the death; (3) defendant can overcome that presumption only by carrying his burden of showing that the sole cause of death was a supervening cause; (4) defendant's theory of supervening causation was "purely speculative," and thus he "utterly failed to rebut the presumption"; and (5) the trial court, in short hand, was merely explaining all of this in the quote above.

¶ 91    If the State's interpretation were correct, the trial court committed error. We have already rejected the State's position that the *defendant* bears the burden of proving the *existence* of a supervening cause. As we said above, due process demands that, once the issue of supervening cause becomes an issue in a trial (as it clearly did here), the State has the burden of disproving it. If the trial court, as the State claims, was assigning the burden of proof to defendant and claiming he did not carry it, we would reverse this conviction on that basis alone.

¶ 92    But we do not think the trial court's comments could be reasonably interpreted as the State urges. In fact, we do not see how anything the trial court said could be taken as a comment on the *merits* of defendant's supervening-cause argument. For ease of reading, we quote the comments one more time:

"With regard to the argument of a supervening cause of death, I don't know if that refers to what happened to him later in life, in terms of how he was positioned in the bed or whatever. I believe that he was put in that state by the defendant's actions."

¶ 93    Defendant says this language, especially the first sentence, shows that the trial court did not understand the concept of "supervening cause." We think that is an overstatement. But we would agree that the court expressed some confusion over defendant's argument, stating that "I don't know if" the supervening-cause argument "refers to *** how he was positioned in the bed or whatever." We mean no criticism of the trial court, speaking extemporaneously, but words such as "I don't know if" and "or whatever" suggest that the trial court might have had less than a firm understanding of the particulars of defendant's supervening-cause argument.

¶ 94    But that is where the second sentence comes in. After its uncertain attempt to paraphrase defendant's supervening-cause argument, the court came back with the reason why that argument failed: because Gerelle "was put in *that state* by the defendant's actions." (Emphasis

- 13 -

added.) That "state"—meaning that state of spastic quadriplegia, which rendered Gerelle defenseless once facedown on the pillow. ("That state" could not have meant the state of being face-down in the pillow; defendant did not cause *that* to happen from his prison cell.)

¶ 95     In other words, even if the trial court was not entirely clear on the specifics of the supervening-cause argument, it did not matter; "whatever" the particulars of that argument might entail (Michelle's gross neglect or her intentional act), Gerelle would not have suffocated if he had not been paralyzed, and he was paralyzed by defendant's actions five years earlier. So the details of the supervening-cause argument did not matter; the State had proven that the paralysis was a contributing cause of Gerelle's death. And so the murder conviction would stand. *Cf. Domagala*, 2013 IL 113688, ¶¶ 21, 41 (trial court "appeared to misapprehend the law" in stating that " '[i]t doesn't matter' whether there was gross medical negligence in this case" because defendant, having battered the victim, would still be liable for murder).

¶ 96     That was error. That reasoning writes the supervening-cause doctrine out of the law. Supervening causation only becomes an issue after the State proves that the defendant's actions were a contributing cause of death, the first prong of the two-prong causation analysis. If contributing cause alone were enough to sustain a murder conviction in this context, the supervening-cause doctrine would cease to exist. And there would be no need for IPI Criminal 4th (Supp. 2011) No. 7.15.

¶ 97     Imagine if it were otherwise. Anyone whose conduct has caused a victim significant injuries or impairments would be liable for murder if those injuries or impairments figured, *in any way whatsoever*, in the victim's eventual death, no matter *what* the accompanying facts.

¶ 98     Say a defendant shoots Victim A, causing paralysis. Five years later, a caregiver intentionally drowns Victim A by holding him underwater. Without a supervening-cause analysis, would the original defendant now be a murderer? After all, if Victim A had not been paralyzed, he might have been able to fight back, so contributing causation exists. Such a result would be preposterous. But under the trial court's reasoning (echoed by the State, we would note, throughout the trial), the original defendant would be liable for murder. The caregiver's intentional act five years later would be utterly irrelevant to the original defendant's guilt for murder.

¶ 99     Or consider the same scenario, but the caregiver places Victim A, wheelchair-bound, perilously dangling on the edge of a curb to a high-traffic intersection, then leaves Victim A unattended. If the wheelchair tips into traffic, causing a vehicle to hit and kill Victim A, is the original shooter-defendant guilty of murder? Again, Victim A would not have been in that situation, paralyzed and wheelchair-bound, were it not for the original act of shooting him. But suggesting that the caregiver's negligence would not at least be *part of the analysis* and that the original defendant would be guilty of murder, regardless, would be wholly unreasonable.

¶ 100    Or transplant facts from a real case, involving an infant, to a boy like Gerelle, paralyzed from an act of abuse. Suppose that child is put to sleep at night, and during the night, a swarm of fire ants invades the bedroom and inflicts thousands of bites on the unattended, immobile child. See *Pearson v. State*, 601 So. 2d 1119, 1121 (Ala. Crim. App. 1992). Is the original defendant guilty of abuse now a murderer? After all, if the child had been of sound body, surely he would have left the bedroom to safety. But it would be absurd not to at least consider the *possibility* that the insect attack constituted a supervening cause, cutting off liability to the original defendant. See *id.* (in case charging defendants with criminal liability for child neglect, attack by ants on sleeping infant was supervening cause of death).

¶ 101    The State did not help matters at trial. It encouraged the trial court to follow its mistaken understanding of the law. The State never acknowledged its burden to prove the absence of a supervening cause of death. Even in its rebuttal argument, after the defense argued the issue, the State simply asserted again that Gerelle, somehow or other, "[o]bviously *** fell into the pillow and suffocated." Never mind how, never mind the details, and never mind whether that was even possible, given what the State's own evidence showed about his physical inability to roll over while wearing braces. Evidently, the State thought that it did not need to take up such questions, because its burden on the element of causation was just to prove that defendant's conduct "contributed to" Gerelle's death by causing his injuries and nothing more.

¶ 102    And the trial court followed the State's lead: In initially announcing its finding of guilt, the court found that Gerelle suffocated in the pillow because of the injuries defendant had caused five years earlier but said nothing responsive to the question, raised by the defense, as to how Gerelle could have gotten himself into the pillow in the first place, given the State's own evidence of his significant motor deficits. In a meticulous ruling, the trial court covered every aspect of this case in full detail but never so much as mentioned supervening causation—not even when directly asked about it by defense counsel, immediately after the ruling was announced.

¶ 103    As we have acknowledged, the trial court was not *required* to say anything about this issue in its findings. But when asked about the omission in the posttrial motion, the court continued to lop off this half of the causation element. Instead of addressing the issue of *supervening* cause, the court merely rephrased its earlier finding that defendant's conduct was a *contributing* cause of Gerelle's death, because five years ago, defendant caused Gerelle's paralysis and resulting limitations. That, in the trial court's view, was enough to sustain the murder charge.

¶ 104    The trial court thus erred by failing to consider whether the State had proven, beyond a reasonable doubt, the absence of a supervening cause in Gerelle's death.

¶ 105                                              D

¶ 106    At oral argument and in its brief, the State argues that a supervening cause could break the causal chain only when it constitutes "gross negligence." Because both the trial court and the State misapprehended the law, we take this opportunity to clarify matters.

¶ 107    We start by quoting IPI Criminal 4th (Supp. 2011) No. 7.15 in full:

> "In order for you to find that the acts of the defendant caused the death of ___, the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death." *Id.*

¶ 108    First and once again, IPI Criminal 4th (Supp. 2011) No. 7.15 makes clear that the presence of contributing causation and the absence of supervening causation are both aspects of the causation element that the State must prove beyond a reasonable doubt. Proving contributing causation, alone, is not enough, at least not in the rare case that supervening causation is at issue.

¶ 109    And obviously, the fact finder will reach the question of supervening causation only if it first finds that the State has proven that the defendant's acts were a contributing cause of death.

If the State cannot even prove contributing causation, an acquittal must follow. So the finding of contributing causation against the defendant is a necessary start but by no means the end of the inquiry.

¶ 110    Just as obviously, as the second sentence of the pattern instruction makes clear, there can be more than one contributing cause of death. The fact that there is a second contributing cause does not *automatically* relieve the defendant (whose actions also contributed to the death) of criminal liability.

¶ 111    For example, if the defendant and another individual both shoot a victim and the coroner cannot identify which of the gunshot wounds was fatal, the defendant remains liable for murder as a principal, because his shooting of the victim was at least one of the contributing causes of death. See *People v. Brown*, 169 Ill. 2d 132, 153 (1996). If the defendant and several other men beat a victim to death, but it is not possible to identify whether the defendant's blows alone were the fatal ones, the defendant nevertheless may be convicted as a principal because his actions at least contributed to the death. See *People v. Martinez*, 348 Ill. App. 3d 521, 530-31 (2004); see also *Nere*, 2018 IL 122566, ¶¶ 33-35 (discussing *Brown* and *Martinez*).

¶ 112    So when *does* the second cause of the victim's death relieve the defendant from criminal liability? According to IPI Criminal 4th (Supp. 2011) No. 7.15, that occurs when the victim's death resulted "from a cause unconnected with the defendant." *Id.* When is a second cause "unconnected with the defendant?" The pattern instruction does not further define that phrase.

¶ 113    We can start with what that phrase does *not* mean. It does not and cannot mean that there is no causal "connection" whatsoever between the defendant's actions and the victim's death. If there is no causal connection whatsoever, there is no *contributing* causation in the first place, and there is no need to consider the question of supervening causation—the defendant is already not guilty of murder. That was the trial court's error, believing that, as long as defendant's conduct contributed to Gerelle's death, the supervening-cause argument failed.

¶ 114    So what do we mean by a cause that is "unconnected with the defendant?" We know this much, for starters: The question of supervening causation speaks to the second element of causation, that of legal causation. And a supervening cause only relieves the defendant of criminal liability if it breaks the causal chain and becomes the sole legal cause of the victim's death, sometimes called the sole proximate cause.

¶ 115    That doctrine is seen more often in tort cases than in the criminal law. But " 'the analogies between civil and criminal cases in which individuals are injured or killed are so close that the principle of proximate cause applies to both classes of cases. Causal relation is the universal factor common to all legal liability.' " *People v. Hudson*, 222 Ill. 2d 392, 401 (2006) (quoting *People v. Lowery*, 178 Ill. 2d 462, 466 (1997)). "Although proximate cause as a prerequisite for liability originated in torts, 'the civil concepts of proximate cause are equally applicable to criminal cases.' " *People v. Cook*, 2011 IL App (4th) 090875, ¶ 17 (quoting *Hudson*, 222 Ill. 2d at 402). As we put it long ago, "[t]he problem of legal causation arises in both tort and criminal law cases, and they are analogous to each other and have been treated in a similar manner by the courts." *People v. Gulliford*, 86 Ill. App. 3d 237, 241 (1980).

¶ 116    Our supreme court has described the second causation element, or legal causation, thusly:

    "Legal cause 'is essentially a question of foreseeability'; the relevant inquiry is 'whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct.' [Citation.] Foreseeability is added to the cause-in-fact requirement

because 'even when cause in fact is established, it must be determined that any variation between the result intended *** and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result.' 1 W. LaFave, Substantive Criminal Law § 6.4, at 464 (2d ed. 2003)." *Hudson*, 222 Ill. 2d at 401.

¶ 117 Though *Hudson* was a felony-murder case, somewhat different than a more traditional murder prosecution, our courts have repeated the notions of fairness and foreseeability in considering supervening causation issues outside the realm of felony-murder prosecutions. See, *e.g.*, *Nere*, 2018 IL 122566, ¶ 31 (to establish legal cause, result of death " 'must be enough similar to, and occur in a manner enough similar to, the result or manner which the defendant intended *** that the defendant may fairly be held responsible for the actual result' " (quoting 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(a), at 630-31 (3d ed. 2018)); *Mars*, 2012 IL App (2d) 110695, ¶ 17 (intervening conduct that is "abnormal and not reasonably foreseeable" will exonerate defendant of criminal liability); *Cook*, 2011 IL App (4th) 090875, ¶ 18 (proximate cause of death in aggravated DUI prosecution "is established if an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." (Internal quotation marks omitted.)); *Gulliford*, 86 Ill. App. 3d at 241 ("in both the criminal law and in tort law the concept of foreseeability of the ensuing harm caused from the culpable act of a defendant plays a large role"); *People v. Caldwell*, 295 Ill. App. 3d 172, 181 (1998) (after defendant beat elderly woman, who suffered broken neck and severed spinal cord in process, family decision to remove woman from life support was not supervening cause of her death, relieving defendant of criminal liability, but instead was "natural and foreseeable result of defendant's wrongful act").

¶ 118 The focus, then, is on whether the second and immediate cause of death is deemed sufficiently within the natural and probable sequence of events (that is, sufficiently foreseeable) that a defendant may fairly be held responsible for the death or whether the immediate cause of death is so "abnormal" or beyond the natural sequence of events (unforeseeable) that a defendant may *not* be fairly held responsible for the result. What is deemed sufficiently "foreseeable" that a defendant may be "fairly" held responsible for the death, notwithstanding the successive cause of death, is the question the fact finder must decide. See *Brackett*, 117 Ill. 2d at 176-77 (legal causation is question of fact).

¶ 119 The State is not wrong to suggest that a second actor's "gross negligence" may be a supervening cause of death. Of course it may. But it is incorrect to say that this can be the *only* instance of a supervening cause. Any number of things could occur within a sequence of events, besides gross negligence, that could be so unforeseeable that it would be unfair to hold the defendant liable for the victim's death.

¶ 120 An act of God, for example. Imagine if Gerelle had died because lightning struck his house and caused an electrical fire in his room, causing Gerelle's death before his mother had the chance to save him. No gross negligence or intentional act there, but a fact finder might reasonably consider the fire to be a supervening cause. Even though Gerelle could have escaped from the room had he not been paralyzed—and thus defendant's conduct contributed to his death—a fact finder might determine that the lightning strike and electrical fire were so far beyond the natural and expected chain of events that it would be unfair to impose liability on defendant for murder.

- 17 -

¶ 121    Or imagine that Gerelle's mother suddenly died of a stroke or heart attack and the two of them lived alone, such that Gerelle was left unattended for several days and died in some way from neglect. The mother would be blameless, of course, but a fact finder could reasonably conclude that her sudden death and the resulting neglect of Gerelle were so beyond the normal sequence of events that it would be unfair to charge defendant with Gerelle's death, even though he could have survived had he not been paralyzed due to defendant's actions.

¶ 122    "Gross negligence" often comes up in the case law because there have been several reported decisions involving medical treatment of a victim grievously wounded by a defendant's conduct. In those cases, the victim dies, and the defendant blames medical negligence as a supervening cause of the victim's death. We have held in those cases that ordinary medical mistakes will not constitute a supervening cause but that gross negligence or intentional malpractice could.

¶ 123    But the reason always comes back to foreseeability, and sometimes we have said so explicitly: Ordinary medical mistakes that contribute to a victim's death do not absolve the defendant of liability because they are considered a foreseeable occurrence after the defendant, by his conduct, placed the victim in the position of requiring imminent lifesaving measures. See, *e.g.*, *Mars*, 2012 IL App (2d) 110695, ¶ 17 ("Unskilled or improper medical treatment that aggravates a victim's preexisting condition or contributes to the victim's death is considered reasonably foreseeable and does not constitute an intervening act unless the treatment is so bad that it can be classified as gross negligence or intentional malpractice."); *People v. Robinson*, 199 Ill. App. 3d 494, 503 (1990) (unless treatment of injured victim is "so bad that it can be classified as gross negligence or intentional malpractice," unskilled or improper medical treatment "is considered reasonably foreseeable and, thus, does not constitute an intervening act"); *Gulliford*, 86 Ill. App. 3d at 241 ("unskillful medical treatment," short of gross or intentional malpractice, "is reasonably foreseeable").

¶ 124    Other times, we have not used the word "foreseeable," instead using the concept of "disconnection" between the defendant's action and the immediate cause of death, as does IPI Criminal 4th (Supp. 2011) No. 7.15. Yet the focus remains on whether the immediate cause of death, the perceived medical negligence, was within or outside the natural causal chain of events, which is just another way of asking whether it was foreseeable. See *Cook*, 2011 IL App (4th) 090875, ¶ 30 (phrase " 'in the natural or probable sequence,' " in jury instruction on proximate cause of death in aggravated DUI prosecution, "incorporates the element of foreseeability").

¶ 125    Here are just a few examples: *People v. Giovanetti*, 70 Ill. App. 3d 275, 284-85 (1979) (emergency cardiac massage that allegedly severed liver of victim, leading to his death, was not supervening cause because "[t]he original trauma inflicted by defendant triggered the sequence of events leading to emergency treatment. That treatment, therefore, hardly qualifies as an act disconnecting defendant's conduct from the ultimate demise as an independent intervening cause"); *People v. Baer*, 35 Ill. App. 3d 391, 395 (1976) ("it is apparent that the acute secondary pneumonia resulted directly from paralysis induced by the blow to the head. It was not a separate intervening act disconnected from the injury inflicted, and therefore will not relieve defendants from liability for the death of [victim]."); *People v. Paulson*, 80 Ill. App. 2d 44, 49 (1967) ("death was caused by an infection which developed during an operation to relieve a hematoma, the hematoma having been caused by a blow to the head allegedly inflicted by the defendant. The chain of events ultimately causing the death of [victim] was set in motion

by the act of defendant, and therefore the resulting infection was not disconnected from defendant's act [citation].").

¶ 126    So that is what IPI Criminal 4th (Supp. 2011) No. 7.15 means when it says the State must prove that the victim's death "did not result from a cause unconnected with the defendant." The State must prove that the successive, immediate cause of death was of a type that was sufficiently foreseeable in the natural sequence of events put into motion by defendant's conduct that it would not be unfair to hold the defendant criminally liable for the death. The immediate cause of death is "unconnected" from the defendant's conduct if it is of a type that is outside the natural causal chain—if it is unforeseeable and thus unfair to hold against the defendant.

¶ 127    We are not suggesting that the "precise manner of death" must be foreseeable, down to the minutiae. *Brackett*, 117 Ill. 2d at 180-81 (after defendant beat elderly woman so severely she could neither swallow nor tolerate feeding tube, her death from asphyxia after nursing-home staff tried to feed her manually was not supervening cause of death: "the defendant did not have to foresee that this victim would die from asphyxiation in order to be guilty of felony murder"); see also *Cook*, 2011 IL App (4th) 090875, ¶ 18 ("Although the foreseeability of an injury will establish [proximate] cause, the extent of the injury or the exact way in which it occurs need not be foreseeable." (Internal quotation marks omitted.)); see also *People v. Johnson*, 392 Ill. App. 3d 127, 131 (2009) (same).

¶ 128    Requiring that level of foreseeability would place an impossible burden on the State. A defendant who grievously injures a victim might not specifically foresee that she will contract meningitis as a postsurgical complication, but he could foresee that *some* medical complication might result from the lifesaving measures prompted by the defendant's wrongful acts. That is why we have tried to emphasize that the question is whether the successive, immediate cause is "of a *type* that a reasonable person would see as a likely result of his or her conduct." (Emphasis added.) (Internal quotation marks omitted.) *Hudson*, 222 Ill. 2d at 401. The State need only show that the immediate cause of death is " 'enough similar to, and occur[red] in a manner enough similar to, the result or manner which the defendant intended *** that the defendant may fairly be held responsible for the actual result.' " *Nere*, 2018 IL 122566, ¶ 31 (quoting 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(a), at 630-31 (3d ed. 2018)).

¶ 129    Here, the evidence showed that Gerelle's mother used a body pillow, an obvious suffocation risk, as a substitute for a bed railing and that she did not check on him for 16 hours after putting him to bed the previous night. The evidence also suggested the possibility of foul play, given that his mother testified that Gerelle was incapable of rolling over while wearing his braces—yet Gerelle appeared to have done just that, rolling over so that his face planted into the body pillow.

¶ 130    Depending on the defense's theory—neglect or foul play or both—the question for the fact finder should have been whether these types of acts or events were sufficiently foreseeable that it would be fair to hold defendant criminally responsible for Gerelle's death. And the State should have been held to the burden of proving as much beyond a reasonable doubt.

¶ 131                                                    E

¶ 132    Having found that the trial court did not fully grasp the causation element of the murder statute and thus failed to hold the State to its burden of proof on the issue of supervening causation, we must determine whether the error requires reversal.

¶ 133    The trial court's misunderstanding of an element at a bench trial is essentially the same as a jury instruction that omits or incorrectly defines an element; in either instance, the result of the error is that the trier of fact was misinformed about the State's burden of proof. *Hernandez*, 2012 IL App (1st) 092841, ¶ 67. So the same standard for reversal should apply. *Id.*

¶ 134    Because the error is a constitutional one, affecting the defendant's right to due process, reversal is required unless it is " 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)); see also, *e.g.*, *People v. Mohr*, 228 Ill. 2d 53, 69 (2008) (applying harmless-beyond-a-reasonable-doubt standard to instructional error); *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003) (same); *People v. Dennis*, 181 Ill. 2d 87, 95 (1998) (same). Thus, reversal is required unless the evidence was so " 'overwhelming,' " or so " 'clear and convincing,' " that the error could not have affected the verdict. *Mohr*, 228 Ill. 2d at 69; *Dennis*, 181 Ill. 2d at 95. The State bears the burden of proving that a constitutional error was harmless. *Sullivan v. Louisiana*, 508 U.S. 275, 278-79 (1993); *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).

¶ 135    The State cannot satisfy this standard just by showing that there was sufficient evidence, such that a reasonable trier of fact, viewing the evidence in the light most favorable to the State, *could* have found in its favor. *Dennis*, 181 Ill. 2d at 95. The State's arguments to that effect, and its reliance on cases finding *sufficient* evidence of causation, significantly understate its burden on harmless-error review. The State must show that there was not merely sufficient but rather *overwhelming* evidence to establish the absence of a supervening cause of death—so that no reasonable trier of fact, properly apprised of the law, would have found that the State failed to carry its burden on this issue.

¶ 136    What evidence does the State offer to that end? Little or none. It bears repetition that the State's case left open serious questions about the circumstances and complete mechanism of Gerelle's death. In particular, there was no direct evidence to establish, with any measure of certainty, how he ended up with his face pressing into the body pillow. And apart from that, it was not even clear exactly how he was positioned when he died, as his body was moved before the scene could be properly investigated and Michelle's recollections on this point were understandably clouded even at the time and all but absent by the time of defendant's trial 14 years later.

¶ 137    So on the pertinent question—how Gerelle wound up in the compromised position in which he died—the trier of fact had to draw an inference from the limited information it had about his position when Michelle put him to sleep, his position when he was found, and the evidence of his physical abilities. There is, of course, nothing wrong with relying on inferences when there is no direct evidence of the events in question. But the inference must be compelling enough to prove that no causal force unrelated to defendant was responsible for Gerelle's death by suffocation.

¶ 138    The evidence established this much: When Gerelle was put to sleep, he was flat on his back, in the center of the mattress (judging from the crime-scene photos, a full-size mattress, or thereabouts; it did not look like a toddler bed). When he was found the next day, he was no longer on his back and no longer in the center of the mattress. It is unclear exactly where he was, but apparently he was somewhere near the edge of the mattress. And the position of his body was somewhat unclear, but he was to some degree "on his side," enough, anyway, that his face could be pressing straight down into the body pillow alongside the bed. The sole

indentation in the body pillow—a small, fluid-crusted, oval indentation in the shape of his mouth—confirmed that his face was in that position.

¶ 139    If Gerelle wound up in this position through his own movement and not as the result of some external—and potentially supervening—cause, then the most natural inference, as the State argued at trial, is that he "rolled over."

¶ 140    Except that he could not, as far as the evidence showed. Above all, Michelle—his own mother and principal caretaker in the years following his injuries—had never seen him roll over with his braces on, and as far as she knew, he was not able to do that.

¶ 141    To be precise, Michelle's testimony was in response to counsel's question whether Gerelle could roll over when he was wearing his "leg braces and arm braces." And while she testified that Gerelle was wearing both, the crime-scene photos and Dr. Denton's testimony—that Gerelle died with his arms locked in the flexed position that the braces were meant to remedy—suggested otherwise.

¶ 142    But even if Gerelle was not wearing his arm braces, that would be far from convincing evidence that he could have rolled over in these circumstances. There is no evidence to suggest (as defendant asserts, in arguing that Michelle could have been grossly negligent) that the arm braces—foam braces that wrapped around Gerelle's elbows—were either meant to keep him from rolling over or capable of doing so. One might even think that they would have made it somewhat easier, by holding his arms straight along his sides, instead of leaving them locked at 90-degree angles, as they were when he died.

¶ 143    What is more, the specialist in rehabilitative medicine, who oversaw Gerelle's therapy for five years and had expert knowledge of the scope of his paralysis, spoke directly to the question of his physical capacities at the time of his death. In his stipulated testimony, Dr. Sisung stated that Gerelle "lacked significant motor control" and could not walk or crawl on his own. If he could roll over on his own, Dr. Sisung surely could have established that fact. Yet he said nothing that even arguably supported the State's inference.

¶ 144    In short, the State presented no evidence that affirmatively supported the inference that Gerelle rolled over on his own. Whether none was available or whether the State simply failed to button-up its case, the point is the same. A rational trier of fact, properly apprised of the State's burden of proof, would look at this gap in the evidence and see a reason to find that the State did not prove the absence of a supervening cause beyond a reasonable doubt.

¶ 145    The State's rollover theory aside, did the evidence overwhelmingly support an inference that Gerelle could have ended up in this position as a result of his own movement? Perhaps he sat up in bed and fell over, his face landing in the body pillow and his body landing on its side? No, Michelle testified that Gerelle could not sit up on his own.

¶ 146    Perhaps a seizure jostled him into this position involuntarily? It seems not; Michelle testified that he no longer needed his seizure medication and that his seizures had been "mild," anyway, causing him to "extend his arms out a little bit and just retract them back. And his eyes would roll back a little bit." Those effects could not explain how Gerelle wound up as he did.

¶ 147    If Gerelle could not walk, crawl, sit up, or roll over on his own and if a seizure could not have caused him to wind up where he did, then how did he get there? The record discloses one last possibility to consider. Michelle testified that Gerelle could "scoot," although she did not describe what that motion involved. (One thinks here of the infant, similarly unable to walk,

crawl, sit up, or roll over, who somehow manages to circumnavigate the crib, entirely on his or her back.) Perhaps Gerelle "scooted" himself into the position in which he suffocated?

¶ 148　　Perhaps. But it is far from clear. It would be one thing if we could infer that he "scooted" to the edge of the bed (as opposed to having rolled over, perhaps more than once, to get into that position) and fell out. Maybe then he could have fallen, with the aid of gravity, into a position that he could not rotate into on his own.

¶ 149　　But the evidence did not clearly show that he fell out of bed at all. The limited evidence available suggests that Gerelle's body, or at least most of it, apart from his head, *was still on the mattress*; it was only his face that was in contact with the body pillow. That is the inference Dr. Denton drew after reviewing Michelle's contemporaneous statements to investigators and other aspects of the crime-scene investigation, as part of his inquiry into the cause of death. The lack of any visible indentation in the body pillow, other than the one caused by Gerelle's mouth, also supports this view of the facts. Michelle's testimony that Gerelle's legs were "alongside the bed" might suggest that his body was next to, not on top of, the mattress. But that testimony, offered 14 years after the fact, is vague and ambiguous at best.

¶ 150　　 In any event, there was nowhere for Gerelle to fall. At 11 inches thick, according to Dr. Denton's measurements, the body pillow was only inches below the plane of the mattress, which was set on the floor. So whatever Michelle meant by "scooting," it does not clearly explain how Gerelle wound up as he did without rolling over, or sitting up and falling over, neither of which he was able to do.

¶ 151　　To be sure, Michelle was concerned about Gerelle "scooting" himself out of bed. That, she said, is why she put the body pillow next to his mattress. And however it happened, in fine-grained detail, Gerelle ended up where Michelle anticipated he might end up. Viewing this evidence in the light most favorable to the State and drawing every possible inference in its favor, a rational trier of fact could find that the State's evidence on the issue of supervening causation was sufficient. But only barely. And barely sufficient evidence is a far cry from overwhelming evidence. We cannot reverse defendant's conviction outright on this basis, but we also cannot say that the trial court's error was harmless beyond a reasonable doubt.

¶ 152　　The State's principal citation, *Brackett*, 117 Ill. 2d 170, does not compel a different result. As a sufficiency case, *Brackett* does not control our harmless-error inquiry. But it still merits scrutiny.

¶ 153　　The defendant in *Brackett* raped and battered an elderly woman, causing significant internal and external injuries that left her unable to effectively swallow, expel food from her trachea, or tolerate a feeding tube. *Id.* at 173-74, 177-78. Yet she had to be fed somehow. Short on options, the nursing home staff took to feeding her pureed food with a spoon, which at first she seemed to tolerate. *Id.* at 174. In the end, however, she died of asphyxiation, after some of that food aspirated into her trachea and she could not expel it. *Id.* at 174-75.

¶ 154　　The State focuses on the supreme court's conclusion that there was sufficient evidence of causation, where the defendant's conduct left the victim vulnerable to choking to death on her food. See *id.* at 177-79. Here, the State analogizes, defendant's conduct left Gerelle vulnerable to suffocating in the pillow. The analogy has some merit, as far as it goes. And it goes to the issue of contributing causation. But *Brackett* did not hold, as the State has claimed (time and again, in the trial court and on appeal), that proof of contributing causation suffices to prove causation generally. Supervening causation must also be absent. *Id.* at 176.

¶ 155    In other words, even though the *Brackett* defendant caused the victim's heightened vulnerability to choking, he would not *automatically* be the legal cause of her death if she wound up choking. It would still matter *how* that result came to pass. And that question could be answered with certainty in *Brackett*. It was clear that the nursing home staff was trying its best to safely feed the victim. But her injuries left them "unable to use a feeding method that would have avoided the possibility of choking." *Id.* at 178. Thus, no matter what the staff did, she would either starve or choke. Her death was imminent, and the causal link between that result and the defendant's conduct was undisturbed by any outside forces, be it intentional misconduct, grossly negligent care, or aberrant and unforeseeable events.

¶ 156    Here, too, it matters how it came to pass that Gerelle suffocated in the body pillow. But here, unlike in *Brackett*, the evidence did not answer that question with clarity. The State had no compelling explanation, consistent with its own evidence of Gerelle's physical capacities, of how he ended up in this compromised position. In a similar vein, a trier of fact may have doubted that Gerelle could *lack* the physical ability to remove his face from the pillow (another key aspect of the State's theory) but *possess* the seemingly greater physical ability to move himself from the center of the bed, where he was lying on his back (with his head on a pillow), to the position he wound up in. There was no overwhelming, or clear and convincing, evidence to rule out the intervention of causal forces independent of defendant's conduct. See *Mohr*, 228 Ill. 2d at 69; *Dennis*, 181 Ill. 2d at 95.

¶ 157    One last point. We do not claim to know, any more than anyone else, how Gerelle wound up in the compromised position that led to his tragic death. And by that we mean three things, all of which bear emphasis. First, we do not claim to know that there *was* a supervening cause of death. Second, even less do we purport to identify a specific supervening cause of death. Third, we are emphatically *not* accusing anyone of culpable conduct.

¶ 158    In sum, a reasonable trier of fact, holding the State to its full burden of proof, could have found that the State failed to establish the absence of a supervening cause beyond a reasonable doubt. Relieving the State of that burden was not harmless beyond a reasonable doubt. Defendant is entitled to a new trial.

¶ 159                                    II

¶ 160    Lastly, we consider defendant's challenge to the sufficiency of the evidence to ensure that double jeopardy does not prevent his retrial. See *People v. Austin M.*, 2012 IL 111194, ¶ 106. We have just explained above that the evidence of causation was sufficient, if only barely. But defendant offers an entirely different challenge to the sufficiency of the evidence, one we must consider as well to satisfy double-jeopardy concerns.

¶ 161    Defendant argues that the evidence was insufficient to prove that his admitted act of shaking Gerelle caused his neurological injuries and eventual death. Rather, he says, the evidence established that Gerelle's skull fracture—which had to be caused by head impact, not shaking alone—caused his neurological injuries. And there was no evidence, he claims, that he caused Gerelle to hit his head and fracture his skull. What is more, these injuries, according to Dr. Joseph Scheller, a pediatric neurologist who testified for the defense, could have been caused by an accident, like a fall onto a hard surface. So there was no evidence that Gerelle's injuries were caused by abuse at all, much less abuse inflicted by defendant.

¶ 162    In summary, the causation at work, according to Dr. Scheller, went like this: Gerelle's skull could only have fractured upon impact; shaking alone could not have produced that result. (Dr.

- 23 -

Goldberg agreed with that conclusion at trial, although the parties dispute whether she took a different view of the matter in 2001.) The skull fracture caused hemorrhaging, which, in turn, caused a cascade of seizures that resulted in Gerelle's neurological, and thus motor, impairments. To prove that defendant contributed to Gerelle's death, the State thus had to prove that he caused Gerelle to hit his head.

¶ 163    The issue, as defendant presents it, is steeped in the expert medical testimony. But we can leave the experts aside. If we accept the premise of defendant's argument—that the State had to prove head impact—the issue boils down to this: Could a reasonable trier of fact, viewing the evidence in the light most favorable to the State, find beyond a reasonable doubt that defendant caused Gerelle to hit his head while shaking him? See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Our answer to this question is yes, which means that defendant's sufficiency challenge fails, no matter what we might conclude about the experts and their testimony.

¶ 164    Defendant says there is no evidence to support this inference: In his confession and plea allocution, he admitted that he shook Gerelle, but he did not admit that Gerelle hit his head.

¶ 165    Defendant's guilty plea is, of course, a judicial admission that he shook Gerelle and thus a fixed point in this case. But defendant's admission was one piece of evidence, among others, at his murder trial. And the trier of fact was free to draw any inferences that the evidence as a whole supported.

¶ 166    Three pieces of evidence are critical. First, Dr. Scheller testified, and no other physician disputed, that the head impact had to occur sometime between January 27 and 29, 2001. (This was based primarily on Dr. Scheller's interpretation of Gerelle's CT scans.) Second, defendant admitted that he shook Gerelle on the morning of January 29, 2001. Third, Gerelle's symptoms became evident immediately after defendant shook him: Having shown no signs of trauma thus far, Gerelle suddenly stopped breathing and presented to the emergency room with decerebrate posturing, an abnormal muscular position that the attending physician immediately recognized as a sign of severe brain injury.

¶ 167    True, Dr. Scheller testified that the timing of the head impact could only be narrowed to roughly a two-day window. And defendant was by no means the only person alone with Gerelle, or charged with his care, during that time. Defendant and Michelle divided responsibility for his care according to their work schedules—Michelle worked days; defendant worked nights—and sometimes left him alone with six-year-old Brianna, when Michelle had to leave for her shift before defendant returned from his. So let us grant that, for all the doctors could know, Gerelle's skull might have been fractured, perhaps accidentally, while he was in someone else's care. But does that mean the trier of fact could not reasonably find otherwise?

¶ 168    No. The trier of fact still had to reconcile this possibility with the other two pieces of evidence we mentioned. That exercise yields the following account of events: Defendant shook Gerelle during the two-day timeframe identified by Dr. Scheller, but Gerelle did not hit his head. Someone else caused Gerelle's skull fracture during that same time frame, but Gerelle did not manifest any symptoms of his neurological injuries when that happened. Instead, those injuries just happened to become evident as soon as defendant shook Gerelle.

¶ 169    Compare that dubious string of inferences to the alternative explanation: Gerelle hit his head and fractured his skull when defendant shook him—by his own admission, during the time frame necessary to cause the injury in question.

¶ 170    Granted, defendant did not include that detail in his confession or his guilty plea. But that fact is not dispositive, at least not if a reasonable explanation of the omission can be found. The trial court thought that defendant "minimized" his conduct, as defendants sometimes do. Or one might think: Someone who was exhausted and frustrated enough to resort to shaking his infant son honestly might not have realized, in that frayed state, that the child's head hit something as it whiplashed.

¶ 171    It is reasonable to reject defendant's account of events as too improbable, perhaps all too convenient, to believe. It would be a striking coincidence if Gerelle had sustained two entirely unrelated traumatic injuries in the span of two days and those injuries simultaneously became evident—as defendant's bad luck would have it, immediately after he shook Gerelle. But upon rejecting that scenario, the only alternative is to find, as the trial court did, that Gerelle must have hit his head when defendant shook him. That would hardly be surprising. And we have identified above two plausible explanations for why that detail was not mentioned in defendant's confession or plea allocution; either he did not realize Gerelle's head contacted something at the time of the shaking, or he did but tried to minimize his conduct to the court.

¶ 172    We cannot say that the trial court's inference was unreasonable. Thus, even if we grant defendant his interpretation of the medical evidence, we must still reject his sufficiency challenge. The State did not fail to prove that defendant caused Gerelle's injuries. A retrial would not violate double-jeopardy principles.

¶ 173                                                      III

¶ 174    One last point. As we have noted, our resolution of the issues raised on appeal does not require us to address the medical evidence presented at trial or the conflicting interpretations of that evidence offered by the parties' respective experts. That said, we are not unsympathetic to defendant's point, in his opening brief, that the scientific underpinnings of the "shaken baby syndrome" and "abusive head trauma" diagnoses have been increasingly called into question by a new body of scientific research in the years since Gerelle's tragic injuries in 2001.

¶ 175    In recent years, courts have started to take note of these scientific developments and to grapple with their implications for the validity of shaken-baby prosecutions in general. See, *e.g.*, *Del Prete v. Thompson*, 10 F. Supp. 3d 907, 909, 957-58, 957 n.10 (N.D. Ill. 2014) (finding that Illinois *habeas corpus* petitioner established "actual innocence" gateway exception, where evidence called into question whether "a claim of shaken baby syndrome is more an article of faith than a proposition of science"). This is a welcome, perhaps long overdue, development. And we are in no way trying to buck that trend. But here, defendant pleaded guilty to shaking Gerelle. Because that is a fixed point in this case, the implications of this emerging research are questions that we must leave for another day. We can only hope that courts and prosecutors alike will approach them with the rigor and caution that they demand.

¶ 176                                              CONCLUSION

¶ 177    Defendant's conviction is reversed. The cause is remanded for a new trial.

¶ 178    Reversed and remanded.