2021 IL App (2d) 190792-U
No. 2-19-0792
Order filed September 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent by except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CF-260 |
| | ) | |
| MONROE A. BARNES, | ) | Honorable |
| | ) | George J. Bakalis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court erred in holding that lack of consent was sufficient to prove use of force in prosecution for criminal sexual assault and aggravated criminal sexual assault.

¶ 2                                  I. INTRODUCTION

¶ 3    Following a bench trial in the circuit court of Du Page County, defendant, Monroe A. Barnes, was convicted of aggravated criminal sexual assault and sentenced to seven years' imprisonment. He now appeals, arguing that he was denied due process when the trial court applied an incorrect legal standard in assessing the evidence and also contending that the State

failed to prove one of the elements of that offense. For the reasons that follow, we reverse and remand.

¶ 4                                       II. BACKGROUND

¶ 5     Defendant was charged with three counts: (1) aggravated criminal sexual assault based on his allegedly causing harm to K.B. while committing criminal sexual assault; (2) aggravated criminal sexual assault based on his allegedly causing K.B. to ingest heroin while committing aggravated criminal sexual assault; and (3) criminal sexual assault based on his committing an act of sexual penetration by use of force. The trial court found defendant guilty on the first and third counts, and it determined that the third count merged into the first count. At trial, the following evidence was presented.

¶ 6     The State first called K.B. K.B. testified that she was born in March 1997. At the time of the trial, she was employed as a paramedic. In 2013, K.B. was 16 years old and attended high school. She had been having issues with drugs and alcohol since she was 11 or 12 years old. She used alcohol and marijuana frequently. She began experimenting with other drugs. She started using heroin when she was about 15 or 16 years old. She was placed in an alternative school that had a substance-abuse program. Her parents knew she used drugs, but were not aware that she used heroin. K.B. was employed at a McDonald's, where she had begun working when she turned 16. She was using a wide assortment of drugs on a daily basis to avoid withdrawal symptoms. During the two months leading up to November 2013, K.B. was using one or two bags of heroin per day.

¶ 7     On November 13, 2013, she was scheduled to work at McDonald's in the afternoon. On that day, she awoke and went to Walgreen's. She had not yet used any heroin, and she was seeking to purchase some. K.B. testified that she was wearing sweatpants and a sweatshirt. She intended

to purchase heroin from defendant. Defendant called himself "Money." K.B. had met him about two weeks earlier at McDonald's. Defendant initially approached her about selling her marijuana, and they exchanged phone numbers. On November 13, 2013, she contacted defendant for the first time about buying drugs. She had money to purchase heroin. They arranged for defendant to pick her up at Walgreen's. Defendant arrived in a black or dark gray sedan. K.B. got into defendant's car, and they discussed her purchasing heroin. Defendant had a gun on his person. They were going to drive to a house where K.B. could purchase heroin. They drove to an apartment building and parked in the garage.

¶ 8   K.B. testified that they entered an apartment, where a white male was present. K.B. sat on the couch. Defendant "set a line for [her] to do of heroin" on the kitchen table. They had not discussed payment, and K.B. assumed that the line was a "taste." She ingested the heroin, and she "felt kind of like in a daze." She "nod[ded] off" and when she "came to" she was on the couch. Only defendant and the white male were present. Defendant was in the kitchen doing something with a blender, and the white male was ingesting heroin at the dining room table.

¶ 9   Defendant "pulled" K.B. to the dining room table. She stated: "It felt aggressive, but again, I was in a daze. So I was like a literal rag doll, I mean, it was hard for me to even walk at this point." Defendant had her by the arm, and she "felt like she was being thrown across the room." She had told defendant that she could not consume any more. Defendant pushed K.B. down on the table. His hand was on her upper back or neck. K.B. ingested some heroin, which she described as a "large amount." She consumed "about two large lines on top of [her] normal amount." She "nodded off again." K.B. stated that she then became nauseous and "stumbled to the bathroom." K.B. testified that she was standing in the bathroom alone, "[h]unched over the sink," and defendant came in and closed the door. Defendant pulled K.B.'s pants down, and she

pulled them back up. He pulled them down again. He penetrated her with his finger. K.B. "was bent over and [defendant] put his penis inside of [her] vagina." K.B. was crying. Defendant also "penetrated [her] anus." It was painful. Defendant ejaculated and left the room. K.B. "nodded off," and the next thing she recalled was leaving the apartment.

¶ 10    When she awoke, K.B. stated that she had to go to work. She had ingested too much heroin and was unable to walk. Defendant carried her to his car and took her to a Jewel store that was across the parking lot from the McDonald's where she worked. Defendant walked her into the Jewel. She was unable to get out of the car without assistance. She identified a photograph showing her and defendant entering the Jewel. She went into the bathroom to change into her work uniform. She did not recall defendant kissing her by the bathroom. Inside the bathroom, she experienced a "[c]omplete blackout." She got changed and was able to walk to the McDonald's, though she did not "really remember the walk, but [she] remembered getting there." When she arrived, her boss realized something was wrong and called K.B.'s mother. Her mother arrived, and the next thing K.B. recalled was being at the ICU. A sexual assault examination was performed.

¶ 11    A few days after leaving the hospital she met with Naperville police officers. She did not tell the police everything that happened. She told them that she was taken to the apartment by her "drug supplier," whose name was Santiago. She stated that her drug supplier had drugged her by giving her a root beer with something in it. She testified that she otherwise accurately described what transpired in the apartment (as is set forth above in her earlier testimony). However, she merely stated that the man who assaulted her was a black male and that no one else was present in the apartment. She stated that she did not know the black man. She explained that she did this because she was afraid of defendant. She was also afraid of her family finding out about her heroin

use. She told the police that she did not wish to pursue the matter. Since November 13, 2013, K.B. has never used heroin.

¶ 12    In 2018, the Naperville police contacted K.B.'s mother. The police stated that they had received a positive result on a DNA test from the evidence recovered when K.B. had the sexual assault examination in 2013. K.B. went to the Naperville police station for a second interview and spoke with Detective Paul Elliot. At this time, K.B. told the police that defendant had picked her up and brought her to the apartment where she was assaulted. She informed the police that what she told them in 2013 about Santiago was not true. She lied because she was afraid of defendant.

¶ 13    On November 13, 2013, K.B. had used a cell phone to contact defendant. She brought the phone to the apartment with her that day. She never saw the phone again after leaving the apartment. She never agreed to have sex with defendant.

¶ 14    On cross-examination, K.B. stated that she recalled telling defendant that she was 17 years old. She acknowledged that at the time of the incident, she was a drug addict. She only snorted heroin and never injected it. A bag of heroin contained about two lines, and she was using one or two bags each day. For the week or two preceding the incident, she was using two bags per day. She was also using marijuana and alcohol at this time but typically did not mix other drugs with heroin. She also sometimes took pills such as Klonopin and Oxycontin. She started using drugs at age 12, and she testified that she had tried "just about every drug" except meth. She was once admitted to the hospital with a blood-alcohol content of .43. She acknowledged having been "in and out of rehabs, various rehabs, [and] behavioral schools through [her] high school years right up to 16."

¶ 15    K.B. testified that she did not recall what time she had to work at McDonald's on November 13, 2013. She also did not recall what time she in fact arrived at the Jewel store near her work.

She did not remember much about the time she spent in the hospital. She did not recall speaking with medical staff or giving a statement to Dr. Rangala, who performed the sexual assault examination. She did, however, recall the examination. She admitted that what she told the police about Santiago was a lie. She denied seeing a woman named Amber or a child in the apartment. However, she acknowledged telling the police that she had. She explained, "I think I just made up a reality in my head." She called it an "impulse lie" and agreed that she was an "impulsive liar" back then. She stated that she had brought money to buy heroin to the apartment, but did not recall how much.

¶ 16    During her first interview with the police in 2013, she did not tell them that she had been assaulted anally. She agreed that, in 2019, she told the prosecutors that she could not recall whether defendant held a gun to her head. She recalled that during the 2013 interview, the police told her that they did not believe what she was saying and that she became upset.

¶ 17    K.B. agreed that she often changed into her work uniform using the bathroom at McDonald's. There was no reason for her to go to Jewel to change. At the time of the incident, she had known defendant for two weeks to a month. She had not purchased drugs of any sort from defendant prior to November 13, 2013. Prior to meeting defendant at Walgreen's, she went inside and stole Mucinex and cough medicine. She took a syringe from her brother's room, which she intended to use for heroin, but she had never ingested it in any way other than snorting it. She later added that she did not intend to use the syringe that day. K.B. denied asking a woman named Amber to "do a threesome." She then stated that she did not recall if a child was present in the apartment. K.B. stated that she voluntarily ingested a line or two of heroin in the apartment. She never paid anyone for the heroin. She did not recall giving defendant any money. After the incident, she asked defendant to drive her to Jewel. Defendant drove her there and walked in with

her.  She did not recall going into the bathroom, though she did remember arriving in the parking lot.  She did not recall defendant threatening her.  She reviewed a surveillance tape from Jewel, where she and defendant walked into Jewel.  She denied kissing defendant.  K.B. spent about two hours on the floor of a stall in the bathroom.

¶ 18    On redirect-examination, K.B. stated that prior to defendant, Santiago was her only supplier of heroin.  She never used a syringe to inject heroin.  On recross-examination, she stated that she did not recall taking any heroin with her when she left the apartment.  She stated that she did not recall the white male being present after the incident in the bathroom, but clarified that she may simply have not remembered him due to blacking out.

¶ 19    The State next called Charles Baker, who stated that he was a background investigator for the Naperville Police Department.  On November 14, 2013, during the early afternoon, he responded to Edward Hospital regarding a reported sexual assault.  He was accompanied by Detective Elliot.  Other officers were already present.  He learned that K.B. had arrived the previous day.  He spoke with medical personnel and K.B.'s mother.  K.B.'s mother had obtained K.B.'s cell phone records from November 13, 2013, and gave them to Baker.  There were numerous calls between K.B.'s cell phone and a phone with the number (312) 931-0286 that took place in the morning up to about 1 p.m.  Baker learned that K.B.'s mother had transported K.B. from K.B.'s place of employment to the hospital and that K.B. had been at a Jewel store shortly before going to work.  Another officer, Officer Krzos, obtained a surveillance video recording from the Jewel.  The recording was played for the trial court.  At about 2:45 p.m., it shows a dark sedan in the parking lot.  Defendant and K.B. enter the store.  Defendant leaves when K.B. enters the bathroom.  At approximately 4:47 p.m., the recording shows K.B. exiting the bathroom.

¶ 20    On November 18, 2013, Baker and Elliot met with K.B. at the Naperville Police Department. On November 20, 2013, Baker contacted K.B.'s cell phone carrier to see if they could "ping" her phone. The carrier was able to identify two locations where the phone was that day. One was near the apartment where K.B. went on November 13, 2013. Baker also obtained records for the phone with the number (312) 931-0286. Defendant's name was associated with that phone account. In March 2014, the case was closed as inactive, as K.B. did not wish to pursue it.

¶ 21    On cross-examination, Baker testified that the police's attempts to locate K.B.'s underwear were unsuccessful. A syringe was recovered from K.B.'s purse. Baker agreed that defendant and K.B. kiss on the surveillance recording. During an interview with K.B. after she had gotten out of the hospital, Baker confronted her with inconsistencies in her story. K.B. became upset and stated she did not wish to pursue the matter further. During his interview with K.B., she never stated that she had been anally assaulted or that defendant had a gun.

¶ 22    On redirect-examination, Baker stated that the police did not start looking for K.B.'s underwear until the day after the incident. During his interview of K.B., Baker showed her a still photograph made from the surveillance recording. K.B. indicated that the man she was with in the photograph was the man that had assaulted her.

¶ 23    Detective Paul Elliot of the Naperville Police Department next testified for the State. He was involved in the initial investigation of this case with Baker. On November 8, 2018, he received a report from the Du Page County crime laboratory that identified defendant as a suspect. He contacted K.B.'s mother. The next day, he spoke with K.B. via telephone. K.B. agreed to meet with him. They met on November 13, 2018. Jenna Trombino, a victim's advocate, was also present. K.B. showed them where the incident had occurred, though she did not know the exact apartment unit. Defendant's girlfriend, Amber Czerwinski, had an apartment in the area.

¶ 24    Elliot learned that defendant was being held in the Lake County jail. On January 4, 2019, he and Detective Reed traveled to Lake County to interview defendant. A video recording was made of the interview and played for the trial court. Defendant was shown a still photograph taken from the surveillance video, and he repeatedly denied having a sexual relationship with the girl in the photograph (*i.e.*, K.B.).

¶ 25    On cross-examination, Elliot agreed that K.B. intended to go to work after she changed clothes at Jewel. He further agreed that some over-the-counter medicine was recovered from K.B.'s purse at the hospital, including "Dramamine, Mucinex, some red capsule, Coricidin chest and cough congestion medicine." A syringe was also recovered from K.B.'s purse. Elliot testified that he contacted K.B. after receiving the results of a DNA report. During the 2018 interview, K.B. admitted lying in 2013. Elliot testified that K.B. told him that initially, when she went into the apartment, "she snorted several lines of heroin consensually and then passed out." Elliot stated that she did not say "one or two." She did, however, state that "when she woke up * * * he grabbed her, [and] put a gun against her head."

¶ 26    Elliot agreed that, in 2018, he did not question K.B. further about the details of the sexual assault. He explained that this was because he "didn't want to victimize her again" and they "had her disclosure initially." The following exchange then occurred between Elliot and defense counsel:

> "Q. Well, Detective, you agree at this time she told you, yeah, I lied about a lot of stuff –
>
> A. Uh-huh.
>
> Q. -- and you didn't think to be more accurate and thorough, that we're going to go through everything including whether this assault even occurred?

A. It's not to be more accurate, it's just – I know the events that she disclosed earlier were traumatic. I didn't want her to have to go through that again because that was already documented.

Q. And you think that's a fair investigation?

A. Yes."

Elliot acknowledged that he did not learn that K.B. was stating that she had been digitally penetrated and anally penetrated until he underwent trial preparation. It was at this time that he also learned that K.B. was unsure whether defendant "had a gun or not." Elliot also testified that defendant advised him that he was in a relationship with a woman named Amber, with whom he had a child.

¶ 27    On redirect-examination, Elliot stated that he never actually handled K.B.'s purse. What he knew about its contents came from reviewing reports. He clarified that when the presence of a gun was discussed with K.B., she never stated that defendant did not have a gun; rather, she was not "clear on the details of how the gun was used."

¶ 28    The State then called Dr. Sangita Rangala. She testified that she is an attending physician in the emergency department at Edward Hospital. On November 14, 2013, Rangala treated K.B. at the Edward Hospital Care Center. On the previous day, K.B. had been "brought in by ambulance for an altered mental state." She "presented in a state of lethargy," with "pinpoint pupils and slurred speech." Her blood pressure was "very low," and "there was worry about a heroin overdose." Her oxygen level was below the range for a healthy person, and she was unable "to blow off enough carbon dioxide to keep her blood pH normal." Rangala added, "[A]ll of those point to some sort of [opiate or] narcotic overdose." Rangala characterized K.B.'s heroin

consumption as being "significant enough that it was life-threatening." K.B. "did not return to a normalized mental state until the following day on November 14, 2013."

¶ 29 Because a sexual assault was reported, Rangala conducted a sexual assault examination. K.B. reported genital pain, and Rangala noted tenderness behind the jaw and across the chest. K.B. stated that she had not engaged in any sexual activity in the preceding 72 hours. During the anal-genital portion of the examination, Rangala observed "abrasions and ecchymoses to the hymen." She added, "Ecchymoses are discolorations associated with bruises." These injuries were fresh; Rangala noted no signs of healing. She observed no trauma to K.B.'s anus, but explained that this is not unusual. Rangala opined, "[T]he hymenal findings of abrasion and ecchymosis were definitive findings of sexual assault." In the report she authored, Rangala characterized her findings as "definitive evidence of sexual assault." Rangala's report also states that K.B.'s family "had requested to obtain a rape kit, as the patient does not remember events leading to altered mental status."

¶ 30 On cross-examination, Rangala acknowledged that she had been told initially that K.B. had not used drugs during the four months preceding the incident. She agreed that the mere fact that there were abrasions to a patient's hymen did not "mean that the person had nonconsensual sex." She further agreed that the existence of trauma does not "equal[] lack of consent." However, she only found trauma in about two percent of children that had been sexually abused. Rangala did not find any other bruising, marks, or scratches to other parts of K.B.'s body. Rangala acknowledged that it was possible that semen ejaculated during vaginal intercourse could "go from the vaginal area to the anal area." Rangala testified that she conducted a thorough physical examination and did not observe any "track marks" or needle marks. The hospital records state that K.B.'s drugs of choice were heroin and cocaine.

¶ 31    On redirect-examination, Rangala testified that K.B.'s injuries occurred less than 24 hours prior to her examination, as she observed no signs of healing.  However, she did acknowledge that it was possible that it occurred earlier.  Medical records indicate that the family did not request that a rape kit be performed until 9:41 p.m. on November 13, 2013.  Rangala believed that the examination was performed "as close as possible to when the concern was noted."  She explained that "a patient has to be alert enough to know what we're doing to be able to consent to what we're doing."  She agreed that "the optimal time in this case would have been after [K.B.] had completed a NARCAN drip and recovered normal mental status."

¶ 32    Rangala testified that while hymenal abrasions do not necessarily indicate lack of consent, they are "consistent with forced sexual trauma."  Regarding K.B.'s mental state at the time she was brought to the emergency room, Rangala explained:

> "From the description of the emergency medicine physician and the hospitalist, her mental state was altered, altered to the point that she was not able to maintain her blood pressure, altered to the point that she was not able to breath enough to maintain oxygen levels, altered enough that she was not trusted to get up and use a bedside commode or have enough control to use a bedpan and therefore needed a Foley [catheter], altered enough that she would get multiple doses of NARCAN, and then the NARCAN drip, which had to be titrated up in dosage."

She added, "This is a significant altering of mental status."

¶ 33    On cross-examination, Rangala agreed that though hymenal abrasions would be consistent with forced sexual intercourse, they can also be consistent with consensual sexual intercourse.

¶ 34    The trial court conducted a brief examination of Rangala.  She stated that when she used the term "force," she meant "with some degree of pressure."

¶ 35    Defendant then testified on his own behalf.  Defendant stated that he knew Amber Czerwinski, Michael Pease, and K.B.  He first met K.B. about a week prior to November 13, 2013. He met her at the McDonald's where she worked.  Defendant was a customer.  Subsequent to meeting her, they had conversations on the telephone concerning her purchasing heroin or marijuana.  Defendant told her that he could not provide her with heroin, but he knew someone that could, namely Pease.  Defendant set up a meeting between K.B. and Pease on November 13, 2013.  K.B. asked defendant if he could drive her to meet Pease.  Defendant agreed.  He drove Czerwinski's car.  He and Czerwinski had gone over to Pease's home earlier, and defendant left from there to pick up K.B.  Defendant testified that he did not have a gun with him.

¶ 36    K.B. appeared "antsy" and "excited" when she got into the car.  They drove to Pease's apartment.  They went inside, and defendant introduced K.B. to Pease and Czerwinski.  Pease called K.B. to the kitchen and "brought the heroin out."  Defendant was not involved in the heroin transaction.  Pease and K.B. both consumed heroin.  K.B. came out of the kitchen and went to the living area.  She sat on the couch; Czerwinski was also sitting on the couch.  Pease and K.B. went back into the kitchen area to discuss the transaction.  They returned to the living room.  K.B. again sat on the couch.  A few moments later, Czerwinski "got upset and went to the bedroom."  Pease and K.B. went into the bathroom.  Defendant followed them into the bathroom.  K.B. and Pease were exchanging heroin for money.

¶ 37    Pease and K.B. returned to the living room.  Czerwinski remained in the bedroom initially and came out later.  K.B. returned to the bathroom.  K.B. was not having any difficulty communicating.  She seemed friendly and flirtatious.  K.B. returned to the bathroom.  A few minutes later, she called defendant to the bathroom.  Czerwinski was in the bedroom at this time.

Defendant entered the bathroom. He testified that K.B. "began to unbuckle [his] pants, and she initiated oral sex on [him]." Defendant continued:

> "After that I got to the point where, you know, like, okay, so I pulled back, I started kissing on her, you know. I was under her shirt, and I was licking on her chest area. I worked my way down, performed slight oral on her before turning her around, and she bent over and we began intercourse."

K.B. never told defendant to stop, and instead stated, "fuck me." Defendant stated that he engaged in intercourse in several positions. After they finished, defendant reminded K.B. that it was "almost time for [her] to go to work."

¶ 38    Defendant left the bathroom. He told Czerwinski that he was going to take K.B. to work. K.B. came out of the bathroom, and they left. Defendant told K.B. that he thought she was going to get ready for work in the bathroom. K.B. replied that she would do so at Jewel. Defendant stated that K.B. had two packets of heroin with her. Defendant parked the car at the Jewel and walked K.B. into the store. She "wrapped her arm around" defendant's arm. They walked straight to the bathroom, defendant gave K.B. a kiss, and he said goodbye. K.B. did not appear to have any difficulty walking when they entered the Jewel store. Defendant then returned to the apartment to pick up Czerwinski, and they went home.

¶ 39    About five years later, defendant was in the Lake County jail. Two Naperville detectives came to speak with him. During this interview, defendant denied having "any physical contact" with K.B. He explained that he was afraid because he " didn't know what could have came [*sic*] from the situation." He added that he did not think anything "sexual would have been an issue because it was consensual." He thought it might have had something to do with "the fact that [he] was trying to buy her marijuana."

¶ 40    On cross-examination, defendant acknowledged lying to the police on a prior occasion, which resulted in a charge of forgery. He stated that when interviewed in 2018, he did not recall K.B., but subsequently, he remembered her during the course of the proceedings before the trial court. He agreed that he lied when he told police in 2018 that he had met K.B. in the Jewel parking lot. He did not recall what vehicle he was driving on November 13, 2013, until he was shown a picture of it. In 2018, when shown a picture of him and K.B. walking into the Jewel, defendant could not recall K.B.'s name. Defendant initially told officers that he did not pick up K.B. and drive her anywhere. The State pointed out numerous inconsistencies in statements defendant made to the police.

¶ 41    Czerwinski had resided in the same apartment complex as Pease a year before the incident. Czerwinski was not attempting to purchase heroin from Pease on November 13, 2013. Defendant and Czerwinski were in an "on again, off again relationship." She was the mother of defendant's children.

¶ 42    On March 4, 2019, defendant called Czerwinski and told her that he planned on beating the case "by her not showing up." He acknowledged being aware that K.B. had consumed heroin prior to the time they purportedly had sexual intercourse in the bathroom.

¶ 43    On redirect-examination, defendant stated that when the police interviewed him, they never asked if he engaged in *consensual* sex with K.B. Had they, defendant would have responded affirmatively. When the police first showed him a picture of K.B. on January 18, 2018, he did not recognize her. This is why his "story changed over a period of time." On recross-examination, he acknowledged that he never volunteered to the police that he had had consensual sex with K.B.

¶ 44    Defendant then called Amber Czerwinski. Czerwinski testified that defendant is the father of her children. At the time of the trial, they were "not together." She recalled the events of

November 13, 2013, "briefly." She and defendant went to Pease's home. Czerwinski testified that they took her car and that she drove. She was unaware of any drug transactions that might transpire. While there, defendant received a phone call from a female. Defendant asked if he could pick her up because "he was hooking her up with [Pease]." Czerwinski assumed that this referred to a dating relationship; however, when K.B. "got there, it was something else." Pease and K.B. went to the kitchen. Czerwinski saw Pease "pull[] out some heroin." This upset Czerwinski, as she does not want to be around heroin. Defendant and Czerwinski argued about this, and Czerwinski then went to a bedroom. A short while later, Czerwinski returned to the living area. Defendant and K.B. were sitting on the couch "quite close together." K.B. "turned to [Czerwinski] and asked [her] to have a three-some with them [*sic*] two." Czerwinski stated that she "got very upset and went back into the room." From the bedroom, Czerwinski texted defendant and said she wanted to leave. Shortly thereafter, she saw defendant leaving with K.B. Defendant said he was taking K.B. home. As K.B. was leaving, Czerwinski did not note anything out of the ordinary about her. She was not staggering or slurring her speech. After defendant returned to the apartment, he and Czerwinski went home.

¶ 45 Czerwinski did not see a gun in her car or Pease's apartment that day. Defendant was not in possession of a gun that day. In fact, she had never seen defendant with either heroin or a gun. Czerwinski did not recall any children being at Pease's apartment on November 13, 2013.

¶ 46 On cross-examination, Czerwinski stated that she and defendant had three children. Defendant provides financial support for the children. Czerwinski and defendant dated for 12 years. Czerwinski and defendant spoke over the telephone while defendant was in the Du Page County jail. He told her that he loved her, and she told him the same thing. They spoke on a near-

daily basis. She had visited defendant in jail on two or three occasions. Czerwinski stated that she does not wish anything bad to happen to defendant.

¶ 47    Czerwinski testified that she knew Pease to be a drug dealer prior to November 13, 2013. However, she acknowledged that she did not ask to leave when the heroin was first pulled out and that she remained in the apartment while defendant took K.B. to work despite its presence. While she was in the bedroom, she never heard noises coming from the bathroom.

¶ 48    The State called John McAnally in rebuttal. McAnally testified that he is an investigator for the Du Page County State's Attorney's office. On June 18, 2019, McAnally called Czerwinski from in front of the condominium. A female answered. He identified himself and asked to speak with Czerwinski. The female stated that Czerwinski was not available at that time. He left his name, title, and phone number for a call back. McAnally went to Czerwinski's place of employment. He approached the receptionist and asked if Czerwinski was there. The receptionist left and a short time later Czerwinski came to the lobby to meet McAnally. McAnally stated that he wanted to speak with her about this case. Czerwinski responded that she was embarrassed that McAnally was contacting her at work and that she would not speak with him. McAnally asserted that he had tried calling, and Czerwinski stated that she would also not talk to him by phone while she was at work. McAnally then chastised her for lying. McAnally said he would call after work; Czerwinski stated that she would not speak with him. Czerwinski never contacted him after that. On cross-examination,, McAnally stated that he understood that Czerwinski was under no obligation to speak with him. On redirect-examination, McAnally stated that he thought the female that answered the phone was lying when she said Czerwinski was not available.

¶ 49    The trial court found defendant guilty of aggravated criminal sexual assault based on his allegedly causing harm to K.B. while committing criminal sexual assault (Count 1) and criminal

sexual assault based on his committing an act of sexual penetration by use of force (Count 3). It determined that the third count merged into the first count. It also acquitted defendant of aggravated criminal sexual assault based on his allegedly causing K.B. to ingest heroin (Count 2).

¶ 50    The trial court issued a memorandum opinion setting forth its findings. It began its analysis by noting the problematic nature of the evidence:

"The evidence presented by both the state and the defense was in many ways contradictory. Within each side's evidence as testified to there was testimony which the court considers to be untrue.

The court has been required to sift through the evidence presented to distinguish what really occurred in this case and to extract the truth from not only the contradictory evidence but acknowledged falsehoods from both parties. What is true beyond a reasonable doubt is the defendant engaged in sexual penetration of the complainant as evidenced by DNA testing. Defendant now contends that this was a consensual act. The complainant denies ever consenting to the sexual act."

It then set forth the evidence that had been presented (which we discuss above).

¶ 51    It noted, in particular, that "[b]y her own admission [K.B.] was a severe drug user." The trial court pointed out inconsistencies in her testimony. For example, it observed that while she initially stated that no one was present in the apartment when they arrived other than a white male, she also told police she recalled a child being present. Similarly, she equivocated on whether she saw defendant put two lines of heroin on the table. The trial court stated, "Throughout her testimony, complainant had difficulty recalling many details of the event or what occurred immediately thereafter." When interviewed by the police the next day, the trial court stated, K.B. "made up a story about by whom and what means she got to the apartment and did not tell the

police of the involvement of the defendant or that the defendant had committed the acts in question." Five years later, DNA "showed defendant to be the person involved in this." K.B. "now told the police a different version of events from her 2013 interview."

¶ 52    Regarding defendant, the trial court observed that he first denied knowing K.B. or having had any contact with her. At trial, however, he "claimed to have a vivid recollection of the events in question."

¶ 53    The trial court found that K.B. "is mistaken about the events surrounding her heroin use at the apartment." It continued, "Whether [K.B] is lying about being forced to consume additional heroin or whether her memory is obscured by her drug use, the court cannot determine." It found that K.B. first consumed heroin that day as "a test to verify that the substance was, in fact, heroin." The trial court noted that K.B. testified that she had brought money with her and that no money was found on her when she was taken to the hospital. It inferred that "she purchased the lines she now claims were forced upon her." It did find K.B. credible "as to the charges themselves."

¶ 54    The trial court then turned to the "crucial question" of consent. It first stated, "It is clear to the court that however complainant consumed the amount of heroin which she did, she was highly intoxicated on drugs as evidenced by her two-hour blackout in the Jewel bathroom." It then found that K.B. "was unable to voluntarily consent to sexual contact due to her highly drugged condition." The trial court further found the fact that defendant initially denied having any contact with K.B. indicative of lack of consent, "If consent was truly what he believed was involved, this would have been the opportunity to so claim." The trial court also found Czerwinski to lack credibility and stated that it "believe[d] she was not even present at the location." The court discounted K.B. allowing defendant to drive her to Jewel or to kiss her as the result of either her fear of defendant or because she "was so drugged and unable to think clearly." In support of the

-19-

latter, the trial court observed, "This severe drugged condition again is shown by her unconsciousness for two hours in the Jewel bathroom." Regarding the use of force, the trial court made the following finding:

"The court finds the defendant guilty of count 1 in that having nonconsensual sexual contact with the complainant he caused bodily harm by bruising and laceration to her hymen. The use of force as to that count is the nonconsensual nature of the act. In *People v. Haywood*, 118 Ill. 2d 263, the Illinois Supreme Court found that non-consent to be [sic] the equivalent of force."

Finally, in denying defendant's motion to reconsider, the trial court stated, "The only question in my mind was was it consensual or was it not consensual." Defendant now appeals.

¶ 55                                    III. ANALYSIS

¶ 56    Defendant raises a number of arguments that flow from a central premise: whether his conviction can stand where the trial court did not find that he used force in the commission of the offenses at issue here. First, he contends his due process rights were violated because he was convicted despite the fact that the State did not establish force, an element of the offenses. Second, he argues he was denied due process because the factfinder, here the trial court, applied a legally erroneous standard of proof in that it omitted an element of the offense. Third, he asserts that he was not proven guilty beyond a reasonable doubt. We find defendant's second argument well taken and we therefore need not consider his first argument. We are not persuaded by his third argument.

¶ 57    Before proceeding further, we note that the State contends that defendant forfeited this issue. We have little difficulty concluding that this error amounted to plain error under the second prong of that test. Plain error may occur when " (1) the evidence is close, regardless of the

seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). While defendant contends both prongs apply here, we will focus on the second one. Defendant is arguing that the trial court erred in finding evidence of lack of consent established that he used force. In *People v. Fonder*, 2013 IL App (3d) 120178, ¶ 25, the court held, "The failure to inform the jury of the elements of the crime charged is so grave and fundamental that the waiver rule should not apply." In *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981) (quoting *People v. Lewis*, 112 Ill. App. 2d 1, 11 (1969)), the supreme court stated, " It is of the essence of a fair trial that 'the jury not be permitted to deliberate a defendant's guilt or innocence of the crime charged without being told the essential characteristics of that crime.' " The error alleged by defendant in this case implicates similar concerns regarding the trier of fact not considering the evidence using the appropriate legal standard. *Nelson*, 2020 IL App (1st) 151960, ¶ 133 ("The trial court's misunderstanding of an element at a bench trial is essentially the same as a jury instruction that omits or incorrectly defines an element; in either instance, the result of the error is that the trier of fact was misinformed about the State's burden of proof."). The essence of defendant's argument is that by mistakenly equating lack of consent with the use or threat of force, the trial court failed to consider the evidence in light of the "essential characteristics" of the offenses with which defendant was charged. We now turn to the merits of defendant's arguments.

¶ 58    Due process does indeed require that the trier of fact understand and apply the proper law. See *People v. Peebles*, 125 Ill. App. 3d 213, 216-17 (1984). It is generally presumed that the trial court understood the law and correctly applied it. *People v. Nelson*, 2020 IL App (1st) 151960, ¶ 88. The presumption may be rebutted where the record affirmatively shows otherwise. *People v. Hernandez*, 2012 IL App (1st) 092841, ¶ 41. The First District has observed, "This presumption

is seldom overcome, but on a few occasions, we have ordered a new trial where it was clear that the court, sitting as the trier of fact, misunderstood some aspect of the burden of proof." *Nelson*, 2020 IL App (1st) 151960, ¶ 89.

¶ 59    The Criminal Code of 2012 (Code) defines criminal sexual assault, in pertinent part, as follows:

> "(a) A person commits criminal sexual assault if that person commits an act of sexual penetration and:
>
> > (1) uses force or threat of force;
> >
> > (2) knows that the victim is unable to understand the nature of the act or is unable to give knowing consent;
> >
> > (3) is a family member of the victim, and the victim is under 18 years of age; or
> >
> > (4) is 17 years of age or over and holds a position of trust, authority, or supervision in relation to the victim, and the victim is at least 13 years of age but under 18 years of age." 720 ILCS 5/11.20 (West 2012).

Aggravated criminal sexual assault is defined as criminal sexual assault committed with any of a number of aggravating factors, including that "the person causes bodily harm to the victim." 720 ILCS 5/11.30 (West 2012). Lack of consent is not an element of these offenses. See *People v. Roberts*, 182 Ill. App. 3d 313, 318 (1989). Rather, consent is a defense that must be raised by a defendant. *People v. Denbo*, 372 Ill. App. 3d 994, 1005 (2007). A defendant raises this defense by presenting sufficient evidence to support the defense; the quantum of evidence has been characterized as "slight" or "some." *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 71. If a defendant successfully raises this defense, the burden is on the State to show lack of consent beyond a reasonable doubt. *Denbo*, 372 Ill. App. 3d at 1005.

¶ 60    In this case, the trial court found that K.B. lacked the capacity to consent, stating K.B. "was unable to voluntarily consent to sexual contact due to her highly drugged condition." We must point out that defendant was not charged under section 11-1.20(a)(2) of the Code, which makes it an offense where: "A person commits criminal sexual assault if that person commits an act of sexual penetration and *** knows the victim is unable to understand the nature of the act or is unable to give knowing consent." 720 ILCS 5/11-1.20 (West 2012). The trial court then held that force was used based solely on this lack of consent; that is, it found that the use of force was inherent in the fact that a victim had not consented to the act.

¶ 61    We note that under established precedent, "[a] conviction for criminal sexual assault cannot be sustained by merely establishing that the victim did not consent." *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 52. The Code defines "force or threat of force" as including, but not being limited to the following:

> "(1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or (2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11.01 (West 2012).

In *Mpulamasaka*, 2017 IL App (2d) 130703, ¶ 74, this court expounded on the use of force:

> "The element of force refers to actions of the defendant that physically compel the victim to submit to the act of sexual penetration. 'Force' within the meaning of [section 11-0.1 of the Code (720 ILCS 5/11.01 (West 2012))] requires something more than the force inherent in the sexual penetration itself. [Citation.] A conviction of criminal sexual assault cannot be sustained by establishing merely that the victim did not consent. [Citation.]

Force is the essence of the crime of rape. [Citation.] Force can be established by evidence that the defendant used his bodily inertia to prevent the victim from disengaging. [Citation.] Physical resistance or demonstrative protestations are not necessary to demonstrate that a victim was forced to have sexual intercourse, and the absence thereof does not establish consent if the victim was threatened or in fear of being harmed. [Citations.]"

In *United States v. Johnson*, 743 F.3d 196, 202-03 (7th Cir. 2014), the Seventh Circuit succinctly stated, "Illinois does not, however, have a statute that criminalizes sexual intercourse with another adult without the other's consent, without more."

¶ 62    The trial court in this case cited *People v. Haywood*, 118 Ill. 2d 263 (1987), in holding that lack of consent equated with the use of force, asserting: "The use of force as to that count is the nonconsensual nature of the act." The trial court went on to state that "[i]n *People v. Haywood*, 118 Ill. 2d 263, the Illinois Supreme Court found that non-consent to be [sic] the equivalent of force." Curiously, in *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74 (citing *Haywood*, 118 Ill. 2d at 274), this court cited *Haywood* for the opposite proposition: "A conviction of criminal sexual assault cannot be sustained by establishing merely that the victim did not consent." Thus, we must examine *Haywood* more closely.

¶ 63    In *Haywood*, a group of defendants argued that the statute defining criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12-13 (now codified at 720 ILCS 5/11-1.20 (West 2012))) was unconstitutionally vague in that the term "force" could be construed so broadly as to "mean simply any force, *i.e.,* simply the physical act involved in the act of sexual penetration, whether with consent or not." *Haywood*, 118 Ill. 2d at 273. The statute had recently been enacted to replace repealed statutes defining rape and deviate sexual assault. *Id.* at 271. The supreme court held that

the legislature intended to retain the definition of force from the repealed statutes. *Id.* at 273. The former statutes contained limitations indicating that "the act was committed 'against the will' of the victim, as in the rape statute, or that the victim was 'compelled' to submit to the act in question, as in the deviate sexual assault statute." *Id.* The supreme court found such a limitation inherent in the term "force":

> "Although the definition of criminal sexual assault under section 12–13(a)(1) does not refer to either compulsion or consent, this does not mean that consent of the victim is irrelevant in determining whether there was an offense. In common understanding, if it is said that one was forced to perform an act, it follows that the person's act was nonconsensual; and if one freely consents to the performance of an act upon oneself, clearly that person has not been forced. Thus, although the prosecution is not required to prove nonconsent formally, it is obvious that if the prosecution shows that there was an act of sexual penetration by force, that evidence demonstrates that the act was nonconsensual. To prove the element of force is implicitly to show nonconsent. Too, if force is established it would be redundant to require a separate showing of nonconsent as part of the prosecution's case in chief." *Id.* at 274.

Thus, *Haywood* stands for the proposition that proof of use of force is also proof of lack of consent. The question remains as to whether it stands for the opposite as well—that is, does proof of lack of consent also prove use of force?

¶ 64    In reviewing the *Haywood* decision, we note that such a proposition would have been extraneous to the issue before the supreme court in that case. As noted, the court was considering the definition of the term "force"; it was not addressing the meaning of the term "consent." Elevating lack of consent to "force" would have done nothing to show that the term "force" was

not vague; indeed, it may have made it more vague. Additionally, it would have been inconsistent with the legislative definition of "force," which defines force in physical terms: "overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11.01 (West 2012).

¶ 65    Perhaps more importantly, we note that allowing lack of consent to satisfy the element of force would render portions of section 11-1.20 of the Code (720 ILCS 5/11-1.20 (West 2012)) meaningless. In pertinent part, the statute makes it a crime to commit an act of sexual penetration where (1) the offender uses or threatens force or (2) the offender "knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." If lack of consent is deemed to be force, subsection (2) serves no purpose. The State could simply prove nonconsent and convict a defendant under subsection (1). It is axiomatic that a court must construe a "statute to avoid rendering any part of it meaningless or superfluous." *People v. Marshall*, 242 Ill. 2d 285, 292 (2011). Accordingly, based on the established precedent noted above, we are compelled to hold that simply proving lack of consent is insufficient to establish that a defendant used force in accordance with section 11-1.20(a)(1) of the Code (720 ILCS 5/11-1.20(a)(1) (West 2012)).

¶ 66    We turn now to the facts of this case. Regarding K.B.'s testimony, the trial court noted that K.B. was a "severe drug user" and that there were numerous inconsistencies in her testimony. It added that K.B. "had difficulty recalling many details of the event or what occurred immediately thereafter." Moreover, when interviewed by the police on the day after the incident, K.B. fabricated many parts of her story. The trial court expressly rejected K.B.'s testimony that defendant physically forced her to ingest heroin, stating it could not tell whether she was "lying about being forced to consume additional heroin or whether her memory [was] obscured by her

drug use." However, the trial court did state that it found K.B. "credible as to the charges themselves."

¶ 67    Nevertheless, the trial court did not base its finding regarding the use or threat of force on K.B.'s testimony about the offense. Instead of citing K.B.'s testimony regarding what occurred in the bathroom, the trial court held: "The use of force as to that count is the nonconsensual nature of the act." The court then went on to state that "[i]n *People v. Haywood*, 118 Ill. 2d 263, the Illinois Supreme Court found that non-consent to be [sic] the equivalent of force." However, as explained above, *Haywood* does not stand for this proposition. Moreover, existing precedent in Illinois establishes that "A conviction of criminal sexual assault cannot be sustained by establishing merely that the victim did not consent." *Mpulamasaka*, 2017 IL App (2d) 130703, ¶ 74; see also *Alexander*, 2014 IL App (1st) 112207, ¶ 52; *Johnson*, 743 F.3d 196, 202-03. Accordingly, the trial court's finding regarding force was based on a misinterpretation of the *Haywood* decision. Properly applying existing precedent would have required the trial court to assess whether K.B.'s testimony about what occurred in the bathroom was sufficient to establish force. Indeed, due process required that it do so. See *Hernandez*, 2012 IL App (1st) 092841, ¶ 64.

¶ 68    We find *Nelson*, 2020 IL App (1st) 151960, to be of considerable guidance here. In that case, the defendant raised a defense of supervening cause to a charge of murder. The defendant argued that the State had failed to disprove the existence of a supervening cause. The State bore the burden of doing so. *Id.* ¶ 73. The reviewing court noted that the trial court made no mention of the State's burden despite making extensive findings. *Id.* ¶ 85. The trial court made an ambiguous statement indicating it believed that but-for causation between the defendant's actions and the victim's subsequent death would be sufficient to sustain the defendant's conviction regardless of the existence of a supervening cause. *Id.* ¶¶ 94-96. The *Nelson* court explained that

this was not the law. *Id.* ¶¶ 96-100. The court concluded, "The trial court thus erred by failing to consider whether the State had proven, beyond a reasonable doubt, the absence of a supervening cause in [the victim's] death." *Id.* ¶ 104.

¶ 69    Such is the case here. The trial court in announcing its ruling did not mention the use of force except in the context of it being inherent in the lack of consent. This led to the trial court failing to address K.B.'s testimony regarding what transpired in the bathroom. While it is true that a trial court is not required to expressly address every issue in its findings, here it made affirmative statements indicating that it did not consider a crucial element when it based its use of force finding solely on lack of consent and failed to mention K.B.'s testimony pertinent to this issue in its entirety. See *Hernandez*, 2012 IL App (1st) 092841, ¶ 52 ("But our analysis is not based on the trial court's silence nor the absence of an explicit finding; we base our conclusion on the affirmative matter showing that the trial court's interpretation of the statute differed from that which we pronounce today."). The *Hernandez* court continued, "Moreover, we believe that the reason the record contains no finding [regarding the] defendant's knowledge *** is because the trial court concluded that this element of knowledge was not required and agreed with the State that it need not be proved." *Id.* A similar error occurred in this case.

¶ 70    Moreover, we cannot find this error harmless. The omission of an error may be deemed harmless where the evidence regarding that element is overwhelming. *Id.* ¶ 67. The evidence is not overwhelming here. The only inculpatory evidence concerning what transpired in the bathroom was K.B.'s testimony. The trial court also specifically rejected her testimony regarding being forced to consume heroin immediately before the events in the bathroom due to her either lying or being unable to recall because of her drug use.

¶ 71    However, we also cannot say that the evidence was so lacking that the State did not prove its case beyond a reasonable doubt under the appropriate standard of review. While it does not appear that the trial court determined the weight to which K.B.'s testimony regarding what transpired in the bathroom would have been entitled, when we assess the sufficiency of the evidence, we are required to consider all of the evidence in the light most favorable to the State. *People v. Arndt*, 351 Ill. App. 3d 505, 512 (2004). We then consider whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Id.* Doing so here, we determine that, viewing the evidence in the light most favorable to the State and crediting K.B.'s testimony about the events in the bathroom, a rational trier of fact could have found all the elements of both crimes of which defendant stands convicted proven beyond a reasonable doubt, including that defendant used force. Additionally, for this reason, double jeopardy also does not preclude retrial. *People v. Drake*, 2019 IL 123734, ¶ 21.

¶ 72    In sum, the trial court erred in concluding that the State proved the use or threat of force by simply establishing a lack of consent. Under such circumstances, defendant's conviction cannot stand.

¶ 73                                  IV. CONCLUSION

¶ 74    In light of the foregoing, the judgment of the circuit court of Du Page County finding defendant guilty of criminal sexual assault and aggravated criminal sexual assault is reversed. As double jeopardy does not bar a new trial, this cause is remanded.

¶ 75    Reversed and remanded.